In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1881

PATRICK RYAN DOCKERY,

*Plaintiff-Appellee,*

*v.*

SHERRIE BLACKBURN and TERRY HIGGINS,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 13 C 4878 — **Jeffrey T. Gilbert**, *Magistrate Judge.*

ARGUED JANUARY 3, 2018 — DECIDED DECEMBER 19, 2018

Before EASTERBROOK and SYKES, *Circuit Judges*, and
REAGAN, *District Judge*.*

SYKES, *Circuit Judge*. Patrick Dockery was arrested after a
domestic dispute at his girlfriend's apartment in Joliet,
Illinois. Sergeant Sherrie Blackburn and Officer Terry
Higgins took him to the police station for booking on charg-

---

* Of the Southern District of Illinois, sitting by designation.

es of trespass and criminal damage to property. He grew confrontational while being fingerprinted, and the officers told him that he'd have to be handcuffed to a bench for the rest of the booking process. Things escalated quickly. Dockery angrily pulled away, fell over, and kicked wildly at the officers. By the time the officers managed to handcuff him, Sergeant Blackburn had used her Taser four times. A security camera recorded the entire incident.

Nearly two years later, Dockery sued the officers for damages under 42 U.S.C. § 1983, accusing them of using excessive force in violation of the Fourth Amendment. The officers moved for summary judgment, claiming qualified immunity based on the incontrovertible facts captured on the booking-room video recording. A magistrate judge denied the motion, and the officers sought interlocutory review.

Our jurisdiction to review an order denying qualified immunity is limited to questions of law; we may not review a determination that the evidence is sufficient to proceed to trial. *See Johnson v. Jones*, 515 U.S. 304, 319–20 (1995); *Stinson v. Gauger*, 868 F.3d 516, 524 (7th Cir. 2017) (en banc). An excessive-force claim requires an assessment of whether the officer's use of force was objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Under this standard and based on the irrefutable facts preserved on the video, the officers are entitled to qualified immunity. The video shows that Sergeant Blackburn first deployed the Taser when Dockery was flailing and kicking and actively resisting being handcuffed. Blackburn then used the Taser three more times to subdue and gain control over a still-struggling Dockery as he kicked, attempted to

stand up, and otherwise resisted commands to submit to their authority. No case clearly establishes that an officer may not use a Taser under these circumstances. Accordingly, we reverse and remand with instructions to enter judgment for Sergeant Blackburn and Officer Higgins.

## I. Background

Our account of the facts comes from the evidence in the summary-judgment record, construed in Dockery's favor as the nonmoving party. *Locke v. Haessig*, 788 F.3d 662, 665 (7th Cir. 2015). There is a qualifier, however: to the extent Dockery's story is "blatantly contradicted" by the video such that no reasonable jury could believe it, we do not credit his version of events. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

On July 13, 2011, Tina Rose called 911 and reported that her boyfriend, Patrick Dockery, was high on phencyclidine ("PCP") and had barged into her apartment at the Evergreen Terrace complex. Based on a prior domestic dispute with Rose, Dockery had been banned from the apartment complex. Sergeant Blackburn and Officer Higgins responded to the 911 call. When they arrived, Rose told them that Dockery had entered her apartment high on PCP and was yelling and punching holes in the wall. She directed them to an upstairs bedroom. There the officers located Dockery sitting on a bed. They also noticed a hole in the bedroom door. They arrested Dockery for trespass and criminal damage to property and transported him to a nearby hospital based on their concern that he was on PCP. Dockery contests their motivation, but this factual dispute is immaterial. The parties agree that Dockery remained calm and cooperative during this time.

Dockery was examined at the hospital and cleared for release, and the officers then took him to the Joliet Police Department for booking. To understand what happened next requires some background on Sergeant Blackburn's Taser x26 model. The Taser x26 has three modes. "Probe mode" or "dart mode" is used when an officer fires a Taser at a distance. The Taser shoots two metal prongs that attach to the subject's body. An electric current flows between the prongs, causing momentary neuromuscular incapacitation by rapidly contracting the subject's muscles. Each trigger pull produces five seconds of 5,000-volt electrical pulses with 19 pulses per second. Both prongs must attach to the subject to cause incapacitation.

Next, an officer may use "three-point" mode when only one working prong is attached to the subject. This often occurs when the other prong misses the target, is damaged, or is pulled out by the subject. To complete the electrical circuit with the attached prong, the officer presses the nose of the Taser directly on the subject's body. Three-point mode thereby produces neuromuscular incapacitation in the same manner as probe mode.

Finally, an officer may use the Taser x26 in "drive-stun" mode. This mode does not require a probe to be attached to the subject. The officer presses the nose of the Taser directly on the subject's body and electricity flows between two electrodes on the end of the device. Unlike the other modes, drive-stun mode does not work by way of neuromuscular incapacitation. The officer instead uses drive-stun mode for "pain compliance," which induces a subject to submit to an officer's directions.

When the officers arrived at the station with Dockery, they led him through the adult booking room and then through an open door into the adjacent juvenile booking room. Security-camera footage from each booking room is in the record. Sergeant Blackburn's Taser also had a built-in video camera that automatically started recording within 1.5 seconds of deployment. The Taser recorded black-and-white footage and audio of the incident.

The officers removed Dockery's handcuffs and permitted him to use a restroom adjacent to the juvenile booking room. That took nearly ten minutes. Dockery then freely wandered back into the adult booking room and calmly sat on a bench for four minutes. He walked back to the juvenile booking room and made a short phone call. Once he finished his call, Sergeant Blackburn told him to come back to the adult booking room for fingerprinting.

Dockery entered the adult booking room and followed instructions to wash his hands. He then walked across the room to the electronic fingerprinting station. Officer Higgins stood next to Dockery and guided his fingers on the machine. About one minute into the fingerprinting, Dockery started to sway and became visibly restless. He tapped Higgins on the shoulder twice before playfully grabbing Higgins's shoulder and shaking it. Higgins regarded this action as disrespectful. He stopped the fingerprinting and took a step back. Higgins called Dockery a "smart ass" and told him that he would be handcuffed to a nearby bench for the rest of the process. Dockery's demeanor immediately changed. He folded his arms across his chest, took a step toward Higgins, and grabbed Higgins's hand. Higgins freed

himself from this grasp, pulled Dockery's hand behind his back, and started to move him toward the bench.

Sergeant Blackburn, who was sitting behind a desk across the room, stood up and unholstered her Taser. But she did not immediately turn the device on. As Higgins continued to guide Dockery toward the bench, Dockery noticed the Taser and abruptly started to move toward Blackburn. She is much smaller than Dockery—three inches shorter and at least 100 pounds lighter. Dockery managed to pull his left arm free from Officer Higgins's grasp, and he aggressively pointed it at Blackburn's face. Blackburn grabbed Dockery's arm with her free hand and brought it behind his back.

A struggle ensued. Dockery rocked back and forth as the officers attempted to handcuff him. Dockery suddenly fell backward, wildly kicked his legs in the direction of Officer Higgins, and then jumped back to his feet. At this point Sergeant Blackburn activated her Taser and fired. The Taser shock briefly incapacitated Dockery; he lay face down on the ground for about two seconds. He then looked over his left shoulder, saw Higgins approaching with handcuffs, and quickly flipped over and kicked his leg out at Higgins for a second time. Both officers retreated and stood a few feet away while ordering Dockery to "get on the ground." Dockery didn't comply with their orders. Instead, he continued to sit upright and appeared to pull out one of the Taser prongs.

Officer Higgins stood about three feet away from Dockery with open handcuffs. The officers again told Dockery to "get on the ground," but he continued to sit upright. Blackburn pulled the Taser trigger three times, but

these trigger pulls were ineffectual because one of the prongs was either damaged or detached. As Sergeant Blackburn moved in closer to Dockery, he turned his body toward her, pointed an arm in her direction, and attempted to stand.

At this point—18 seconds after the first Taser shock—Sergeant Blackburn directly applied the Taser to Dockery's upper back for a split second as she tried to reposition him on the ground for handcuffing. Specifically, she pushed down on his shoulder with her left hand as she applied the Taser with her right. Dockery still didn't comply. He very quickly rolled toward Blackburn with his arms and legs outstretched.

Sergeant Blackburn tried again. She positioned herself behind Dockery a second time and briefly applied the Taser to his upper back. The parties dispute whether the Taser actually made contact with Dockery, but we assume that it did. Dockery rolled away from Blackburn. She then approached again and directly applied the Taser to Dockery a third time, leaning into him so that he would lie face down on the ground. Blackburn and Higgins held him on the ground as two other officers ran into the room to assist. The four officers then managed to handcuff Dockery. The entire episode—from the first Taser deployment until the handcuffing—lasted under one minute.

Dockery maintains that he was not intentionally resisting the officers' efforts to handcuff him. He says he lost his balance because he is overweight and inflexible, and he fell over from the pain of being forced into a single pair of handcuffs. For support he presented photographs of wrist lacerations from the handcuffs, and he notes that Sergeant

Blackburn and Officer Higgins used two linked pairs of handcuffs when they first arrested him. Finally, he insists that his actions after the first Taser deployment were involuntary reactions to the shock, not intentional acts of resistance. Again, this factual dispute is immaterial. Excessive-force claims are evaluated against a standard of objective reasonableness. Whether Dockery actually intended to resist does not matter. What matters is how a reasonable officer would construe the circumstances.

Another dispute centers on how the different Taser modes affect the human body. The parties agree that one of the probes was damaged or removed after the initial shock. So only the three-point or drive-stun options remained available to Sergeant Blackburn, and both required direct contact with Dockery's body. The officers maintain that she used drive-stun mode for pain compliance. Dockery contends that she used the three-point mode, causing neuro-muscular incapacitation. A review of the record, including the Taser summary report, does not conclusively establish which mode was used. We therefore assume at this stage that Dockery's assertion is correct.

Dockery was charged with trespass, criminal damage to property, and obstruction. He was convicted of trespass and sentenced to 180 days in jail. Nearly two years after the incident, Dockery filed this suit under § 1983 and state law against Sergeant Blackburn, Officer Higgins, the City of Joliet, the Joliet Police Department, and additional named and unnamed Joliet officers. He asserted four claims: (1) use of excessive force in violation of the Fourth Amendment; (2) malicious prosecution; (3) denial of medical care; and (4) inadequate training in the use and deployment of a Taser.

A magistrate judge, presiding by consent, recruited pro bono counsel for Dockery, and the defendants moved for summary judgment.

The magistrate judge entered judgment for the defendants on most claims, but he allowed the excessive-force claim against Sergeant Blackburn and Officer Higgins to go forward. As relevant here, the judge denied the officers' claim of qualified immunity.

## II. Discussion

Excessive-force claims are governed by the Fourth Amendment's "reasonableness" standard, which turns on the totality of the circumstances confronting Sergeant Blackburn and Officer Higgins viewed from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and allowing for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

The Supreme Court has instructed us to weigh the nature and extent of the force used against the severity of the suspect's crime, the nature and immediacy of the threat he posed to the officers or others, and the extent to which the suspect actively resisted or attempted to evade arrest. *Id.* at 396. Whether a particular use of force was objectively reasonable "is a legal determination rather than a pure question of fact for the jury to decide." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012). A threshold question, however, concerns appellate jurisdiction.

**A. Appellate Jurisdiction**

An order denying summary judgment ordinarily is not an appealable "final decision" under 28 U.S.C. § 1291, but an exception exists for an order denying a claim of qualified immunity. *See Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014). Qualified immunity is "immunity from suit rather than a mere defense to liability," so pretrial orders denying qualified immunity are generally reviewable under the collateral-order doctrine. *Id.* at 771–72 (quotation marks omitted).

But interlocutory review of a denial of qualified immunity is limited to pure questions of law. As the Supreme Court explained in *Johnson v. Jones*, "a defendant[] entitled to invoke a qualified immunity defense[] may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." 515 U.S. at 309, 319–20.

At issue in *Johnson* was whether five police officers used excessive force during an arrest that left the plaintiff hospitalized with broken ribs. *Id.* at 307. Three officers moved for summary judgment on qualified-immunity grounds, asserting that they did not participate in the beating. *Id.* at 307–08. The district court denied the motion, reasoning that the plaintiff raised a genuine factual issue about whether the officers had participated in the beating. *Id.* On appeal the officers asserted that the district court's adoption of the plaintiff's story was not supported by the record. The Supreme Court held that the interlocutory order—which "determine[d] only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial"—was not immediately appealable. *Id.* at 313.

Two post-*Johnson* cases clarify the distinction between nonreviewable qualified-immunity orders based on evidentiary sufficiency and reviewable qualified-immunity orders based on "more abstract issues of law." *Id.* at 317. First, in *Scott v. Harris*, the Court considered a claim that a police officer used excessive force when he rammed the plaintiff's car during a high-speed chase captured on video. 550 U.S. at 375. At summary judgment the district court rejected the officer's claim of qualified immunity, finding a genuine factual dispute about the degree of danger posed by the plaintiff's reckless driving. *Id.* at 376. The Eleventh Circuit affirmed. *Id.*

The Supreme Court reversed, ruling that the plaintiff's story was "utterly discredited" by the videotape. *Id.* at 380. The Court observed that although "there is no obvious way to quantify the risks on either side, it is clear from the videotape that [the plaintiff] posed an actual and imminent threat to the lives of [others]." *Id.* at 383–84. Because the reasonableness of the officer's actions is ultimately a legal question and the video conclusively established that the car chase "posed a substantial and immediate risk of serious physical injury to others," the Court held that the officer was entitled to summary judgment. *Id.* at 386. In other words, *Johnson* did not preclude immediate appellate review; the Court determined that it could rule as a matter of law on the question of objective reasonableness in light of the historical facts captured on video.

*Plumhoff v. Rickard* involved another excessive-force claim arising out of a high-speed police chase that was captured on video. The chase ended after officers shot at the fleeing car, causing it to crash. 572 U.S. at 770. The district court denied

the officers' motion for summary judgment based on quali-
fied immunity, finding a genuine factual dispute about the
degree of danger posed by the suspect's high-speed flight.
*Id.* The Sixth Circuit affirmed. *Id.* The Supreme Court re-
versed, explaining that *Johnson* did not defeat appellate
jurisdiction:

> The District Court order in this case is nothing
> like the order in *Johnson*. Petitioners do not
> claim that other officers were responsible for
> shooting [the plaintiff]; rather, they contend
> that their conduct did not violate the Fourth
> Amendment and, in any event, did not violate
> clearly established law. Thus, they raise legal
> issues … .

*Id.* at 793. The Court went on to apply the objective-
reasonableness standard to the facts as depicted on the
video, holding that the officers' response to the car chase
was reasonable under the circumstances. *Id.* at 775–81.
Alternatively, the Court held that the officers were entitled
to qualified immunity. *Id.* at 781.

On the jurisdictional point at least, Dockery's case is ma-
terially indistinguishable from *Scott* and *Plumhoff*. The
constitutional question—whether the deployment of the
Taser was a reasonable use of force under the circumstanc-
es—is an objective inquiry that turns on how a reasonable
officer would have perceived the circumstances. *See Phillips*,
678 F.3d at 520. In light of the video recording, which cap-
tured the entire episode, this appeal raises a pure legal
question about the officers' entitlement to qualified immuni-
ty.

Dockery responds that the video is subject to multiple interpretations, one of which supports his contention that he did not intend to resist the officers but simply fell because he is overweight and inflexible, and his arms had been painfully wrenched behind his back. He also maintains that he made "no move to stand, no move to strike the officers, and no threats." As we've explained, his intent to resist is immaterial under the objective test; we ask only how a reasonable officer would have perceived the circumstances. And Dockery's claim that he made no aggressive moves toward the officers after the first Taser shock and did not try to stand up is "utterly discredited" by the video, *Scott*, 550 U.S. at 380, which clearly depicts his physical resistance to the officers' attempts to handcuff him both before and after the first Taser shock. *Johnson* does not preclude review.

## B. Qualified Immunity

A public official is entitled to qualified immunity from suit unless he violated a clearly established constitutional right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). As applied to a Fourth Amendment excessive-force claim, the qualified-immunity doctrine gives "enhanced deference to officers' on-scene judgments about the level of necessary force." *Abbott v. Sangamon County*, 705 F.3d 706, 725 (7th Cir. 2013).

Qualified-immunity analysis usually entails a two-step inquiry: we ask (1) whether the facts alleged or shown by the plaintiff establish a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). This order of inquiry is not rigid, however; we may address the second question first if it simplifies the analysis. *Id.* at 227; *Abbott*, 705 F.3d at 715.

To show that a right is clearly established, the plaintiff must demonstrate that existing caselaw at the time of the events in question "placed the statutory or constitutional question beyond debate." *Al-Kidd*, 563 U.S. at 741. Qualified immunity cannot be defeated simply by "alleging [a] violation of extremely abstract rights." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). The Supreme Court has cautioned us not to define the constitutional right in question at a "high level of generality." *Id.* (quotation marks omitted). Instead, to place the constitutional question beyond debate, the precedent must be "particularized to the facts of the case." *Id.* (quotation marks omitted). A plaintiff may also overcome an officer's qualified immunity by showing that the conduct in question is "so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott*, 705 F.3d at 723–24.

We have two guideposts in an excessive-force case like this one. The first is that an officer's use of a Taser against an actively resisting subject either does not violate a clearly established right or is constitutionally reasonable. *Id.* Examples of active resistance include "kicking and flailing," *Clarett v. Roberts*, 657 F.3d 664, 674–75 (7th Cir. 2011); declining to follow instructions while acting in a belligerent manner, *Forrest v. Prine*, 620 F.3d 739, 745–46 (7th Cir. 2010); and swatting an arresting officer's hands away while backpedaling, *Brooks v. City of Aurora*, 653 F.3d 478, 481 (7th Cir. 2011).

The second guidepost is that an officer may not use significant force (like a Taser) against a "nonresisting or passively resisting" subject. *Abbott*, 705 F.3d at 732. For example, we have rejected a claim of qualified immunity where

officers used force against a "docile and cooperative" sus-
pect who posed no threat and "did not resist arrest in any
way." *Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th
Cir. 2003). In another case falling on the extreme side of this
line, we have held that "[t]he Constitution clearly does not
allow police officers to force a handcuffed, passive suspect
into a squad car by breaking his ribs." *Rambo v. Daley*, 68
F.3d 203, 207 (7th Cir. 1995).

In some cases each discrete use of force must be separate-
ly justified. *See Deering v. Reich*, 183 F.3d 645, 652 (7th Cir.
1999) ("[W]e carve up the incident into segments and judge
each on its own terms to see if the officer was reasonable at
each stage."). We think a sequential analysis is appropriate
here and therefore divide our discussion between the first
use of the Taser and the subsequent deployments when
Dockery was on the ground.[1]

### 1. *First Taser Deployment*

Dockery maintains that he was not actively resisting
when Sergeant Blackburn first used the Taser. That claim
cannot be reconciled with the facts captured on video, as
Dockery's counsel essentially conceded at oral argument.
The video shows that Dockery was uncooperative and
physically aggressive when the officers tried to handcuff
him, rocking back and forth and twice escaping their grasp.

---

[1] For the first time on appeal, Officer Higgins asserts that he is inde-
pendently entitled to summary judgment because *he* never used the
Taser. He argues that Dockery should have asserted a failure-to-
intervene claim against him rather than an excessive-force claim. Because
we hold that qualified immunity shields both officers from suit for use of
excessive force, we do not address this argument.

When he fell backward, he wildly kicked in their direction and immediately jumped to his feet. Under these circumstances we have no difficulty concluding that the first use of the Taser is protected by qualified immunity. *Clarett*, 657 F.3d at 674–75.

### 2. *Subsequent Taser Deployments*

Dockery argues that after the first Taser shock, he "was on the floor of the booking room, either sitting calmly or curling and rolling as a result of Taser-induced involuntary muscle contractions." He compares his case to *Abbott v. Sangamon County* and *Cyrus v. Town of Mukwonago*, 624 F.3d 856 (7th Cir. 2010), but neither case supports his claim.

Take *Abbott* first. There an officer fired his Taser in probe mode at a woman who angrily approached him and ignored his order to stop. 705 F.3d at 729. According to the plaintiff—a nonviolent misdemeanant—there was "no question" that this first Taser jolt subdued her: "[S]he immediately fell to the ground and convulsed but made no movement." *Id.* at 732. The officer then used the Taser again when the plaintiff failed to obey the officer's instruction to turn over. We held that a jury could find that the second Taser deployment constituted excessive force because the suspect was already subdued and the officers had time to appreciate that fact. *Id.*

Dockery maintains that his case is materially similar because he did not respond to the officers' orders while sitting immobile on the ground for 18 seconds. He adds that Sergeant Blackburn and Officer Higgins had time to recognize that he was subdued by the first shock. Again, this account is flatly contradicted by the video. Unlike the plaintiff in *Abbott*, Dockery did not react to the first Taser shock as

if he were stunned or incapacitated. Within two seconds of falling, he flipped over and kicked his left foot in Higgins's direction. He then sat up, pulled the Taser prong out of his arm, and ignored the officers' instructions to lie down. In short, his combative demeanor never changed, and he did nothing to manifest submission to being handcuffed.

*Cyrus* is likewise not closely analogous. There a resisting suspect "barrel-rolled" down a driveway after an initial Taser shock. 624 F.3d at 859. He had stopped moving and was lying still on his stomach with his hands underneath him when the officers approached and deployed the Taser again several times. *Id.* at 860. The district court entered summary judgment for the officer, concluding that the use of the Taser after the barrel-roll was objectively reasonable. *Id.* at 861. We reversed based on conflicting evidence in the summary-judgment record about how many times the Taser was discharged, whether the barrel-roll could be interpreted as an attempt to flee, and whether the suspect posed a risk to the officers while lying face down. *Id.* at 862–63.

Here there is no similar evidentiary conflict. The video unequivocally shows that Dockery did not submit to the officers' authority after the first Taser shock. Instead he sat up, pulled out one of the prongs, pointed an arm in Sergeant Blackburn's direction, attempted to stand up, and otherwise ignored the officers' commands to get on the ground. *Cyrus* does not help him.

This case more closely tracks *Brooks v. City of Aurora*, which involved an excessive-force claim by a suspect who backpedaled and swatted at a police officer who was attempting to arrest him. The suspect then stood still and "passively" faced the officers for a few seconds but did not

manifest submission, so the officer pepper sprayed him. 653 F.3d at 487. We concluded that the officer was entitled to qualified immunity because the plaintiff "ha[d] not submitted to the officer's authority, ha[d] not been taken into custody[,] and still arguably could [have] pose[d] a threat of flight or further resistance." *Id.* A similar conclusion flows from the video evidence here, which unambiguously shows that Dockery had not submitted to the officers' authority and was far from subdued when Sergeant Blackburn applied the Taser three more times.

Lacking closely analogous precedent, Dockery argues in the alternative that this use of force was "so egregious and unreasonable" that no officer could believe that he was acting lawfully. *Abbott*, 705 F.3d at 723–24. To prevail on this backup argument, Dockery must place the unreasonableness of Sergeant Blackburn's and Officer Higgins's actions "beyond debate." *Al-Kidd*, 563 U.S. at 741. He has not done so. Even if the officers misconstrued his actions or misjudged the amount of force needed to subdue him, qualified immunity protects officers from mistakes in judgment of this sort.

### III. Conclusion

For the foregoing reasons, Sergeant Blackburn and Officer Higgins are entitled to qualified immunity. We REVERSE the judgment of the district court and REMAND with instructions to enter judgment in favor of the defendants.