In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 18-1809 & 18-1821

HYUNG SEOK KOH, *et al.*,

*Plaintiffs-Appellees*,

*v.*

JOHN USTICH, *et al.*,

*Defendants-Appellants*.

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cv-02605 — **Edmond E. Chang**, *Judge*.

ARGUED FEBRUARY 22, 2019 — DECIDED AUGUST 13, 2019

Before RIPPLE, MANION, and BRENNAN, *Circuit Judges*.

MANION, *Circuit Judge*. Hyung Seok and Eunsook Koh, husband and wife, brought a § 1983 suit arising out of the investigation of and the Kohs' arrests in connection with their son's death. They sued the Northbrook Police Department, various Northbrook officers, the Wheeling Police Department, and a Wheeling officer asserting state and federal claims. The district court granted in part and denied in part the defendants' motions for summary judgment. Northbrook

Detectives John Ustich and Mark Graf and Wheeling Officer Sung Phil Kim have filed interlocutory appeals on the issue of qualified immunity concerning Mr. Koh's Fifth Amendment coerced confession claim. Because appellants' arguments are inseparable from the questions of fact identified by the district court, we dismiss these appeals for lack of jurisdiction.

I.

Around 3:45 a.m., on April 16, 2009, Mr. Koh was awakened by his wife's screams. Mrs. Koh had just found their 22-year-old son, Paul, lying down in a pool of blood next to a knife in the entryway of their home.[1] After calling 911, the couple got dressed, anticipating going to the hospital after help came because they thought Paul was still alive. Paramedics and officers from the Northbrook Police Department (Defendants Roger Eisen, Matt Johnson, Brian Meents, and Keith Celia, none of whom are appellants) arrived at the Koh home soon after. There, they found Mr. Koh with a phone near the front door of the house and Mrs. Koh crouched over Paul's body. Paul had been stabbed in the throat and chest and was declared dead at the scene. Officers initially stated there was a possibility Paul committed suicide.

Mr. Koh wanted to drive to the hospital. Instead, both Mr. and Mrs. Koh were confined in their front yard and pushed to the ground, where they sat while officers watched over them. The Kohs asked to see Paul, get Mr. Koh's medicine[2] and cell

---

[1] Because this appeal reviews a denial of motions for summary judgment, we take the facts in the light most favorable to the Kohs, the non-moving parties. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[2] Mr. Koh took medication for diabetes, high blood pressure, and hyperammonemia.

phone, and go to the hospital. The officers denied those requests.

At some point, the officers forced the Kohs into a squad car and drove them to the Northbrook Police Department. (The Kohs were not asked if they wanted to go there.) Mrs. Koh was allowed to wash the blood from her hands in a restroom at the station while officers kept an eye on her. The Kohs were then given blankets and beverages. They were kept in a conference room, first together and then later separated. Mr. Koh asked to make a phone call, but was not allowed to do so. The police contacted the Kohs' pastor who arrived at the station around 6 a.m. Other family and friends came to the station as well, but their requests to see the Kohs were denied.

While still at the Koh home, a Northbrook police officer spoke with dispatch about contacting local law enforcement agencies to request a Korean translator who could assist with speaking with the Kohs because of the apparent language barrier.[3] Responding to the request at the direction of one of his superiors, Officer Sung Phil Kim of the nearby Wheeling Police Department went directly to the Northbrook Police Department. Kim spoke Korean in social settings, having learned Korean from his parents and at Sunday school as a child, but otherwise having no formal training in the Korean language. Kim also had no training as a translator.

Mr. Koh was questioned at the Northbrook police station in a two-part interview that lasted a total of two and a half

---

[3] The officer declined using Language Line, a telephonic interpretation service used by police, and instead requested someone who could be physically present for the Kohs' interviews.

hours. Detectives John Ustich and Mark Graf,[4] and Kim were present for both sessions, and they all questioned Mr. Koh during his interviews. Graf primarily conducted the interview, and Ustich and Kim each posed questions at different points. Kim also provided some Korean translations during the interview, but not to each question. Each interview was video recorded, though there was discussion between Graf and Mr. Koh before the recording began and at the end of the first interview when the tape ran out.

The first interview began around 7:30 a.m. Before the video recording began, Mr. Koh asked Graf for his medication. Graf responded that someone would bring him his medicine. Also before the recording commenced, Graf asked Mr. Koh if he had a lawyer. Mr. Koh told Graf that he had an attorney, but he could not remember the attorney's phone number. Mr. Koh also asked to see his pastor, his daughter, and his friend from church. According to Mr. Koh, Graf "told me that the only person I could see was a lawyer. And since I didn't have any phone numbers, so that was the end."[5]

Graf administered *Miranda* warnings in English. While Graf was reading Mr. Koh the *Miranda* warnings, Kim provided some translation assistance. Kim, however, did not translate after Graf stated, "Anything you say can and [sic] be used against you in a court of law, okay?"[6] Mr. Koh gently

---

[4] While not one of the responding officers, Ustich came to the Koh home shortly before 6 a.m. and relayed to Graf the information that he learned while there prior to the interview.

[5] District Ct. Docket Entry 289-1, Pretrial Hr'g Tr. at 15:23–16:1.

[6] District Ct. Docket Entry 285-3, Interview Tr. at 2. (In addition to the three video recordings of Mr. Koh's interviews (District Ct. Docket Entry 285-1 (Interview Video)), the parties and, in turn, the district court relied

nodded his head while Graf was reading the warnings. Once finished reading the warnings, Graf passed Mr. Koh a printed waiver form listing the *Miranda* rights in English asking him to sign and date the form. It was then that Mr. Koh asked, "Can you ask (inaudible) this one transfer this one?"[7] The officers understood this as a request for Kim to translate, and Kim proceeded to speak to Mr. Koh in Korean. The parties dispute, though, the accuracy of Kim's translation and whether Mr. Koh understood it. According to Mr. Koh, Kim did not tell him that his statements could be used against him or that he had a right to an attorney if he could not afford one. Mr. Koh also asserts that Kim advised that he did not need an attorney. After Kim completed his translation, Mr. Koh began to date and time the form stating, "This one happens [early morning]."[8] It was then that Graf instructed Mr. Koh to write "[t]he date and time right now."[9] As the district court described it in its summary judgment opinion, "Mr. Koh ultimately executed an English-language *Miranda* waiver form *at Graf's and Kim's directions*." *Koh v. Graf*, 307 F. Supp. 3d 827, 837 (N.D. Ill. 2018) (emphasis added).

After Mr. Koh signed the waiver form, Graf offered Mr. Koh beverages and food, but Mr. Koh only requested wa-

---

on a transcript of Mr. Koh's videotaped interviews in support of their summary judgment motions (District Ct. Docket Entry 285-3 (Interview Tr.)). The Kohs did not stipulate to the accuracy of the transcript, but agreed to its use at summary judgment. We rely on the recordings and transcript as well.)

[7] District Ct. Docket Entry 285-1, Interview Video 1 at 1:35, Interview Tr. at 2.

[8] Interview Tr. at 2; Interview Video 1 at 2:21.

[9] Interview Tr. at 2; Interview Video 1 at 2:24.

ter. Graf began asking questions in English with little inter-
vention by or assistance from Kim. Mr. Koh answered some
questions and communicated in basic English, though some
of his responses to Graf's questions were confusing or non-
responsive. For instance, at the beginning of the interview
when Graf asked Mr. Koh, "Why don't you tell us briefly
about your son and what he does, his friends, what type of
person he was," Mr. Koh responded by explaining what he
did the day before.[10] Throughout the first interview, Mr. Koh
repeatedly denied any involvement in Paul's death, including
when Graf asked him if he had an argument with Paul. Dur-
ing that first session, Graf asked Mr. Koh about Paul's depres-
sion and marijuana use. This first interview lasted about 55
minutes.

After the first interview, Ustich and Graf thought Mr. Koh
was being evasive, and they found his denials of any involve-
ment in Paul's death unbelievable. Ustich and Graf then met
with their superiors and members of the team investigating
Paul's death. Kim did not participate in that meeting. At the
meeting, Ustich and Graf learned about evidence obtained up
to that point in the investigation. There was evidence suggest-
ing there was a struggle (e.g., there was a small metal cross
and broken chain discovered in blood on the floor). There was
also evidence of a cleanup in the master bedroom, which con-
tradicted Mrs. Koh's statement to police that neither she nor
her husband cleaned up in the bathroom after finding Paul's
body. Ustich and Graf also learned that while Mr. Koh had
told them that he and his wife had turned Paul's body over,
Mrs. Koh told police that she had not moved Paul's body.

---

[10] Interview Tr. at 3–4.

Also, a neighbor had heard a scream, which prompted skepticism by Graf that Mr. Koh, who had told Graf that he was a light sleeper, could have slept through Paul's death.

Ustich and Graf also learned that Mr. Koh and Paul's relationship was marked by tension. Northbrook police officers had previously seen Paul walking in the Kohs' neighborhood late at night because he had gotten into a fight with Mr. Koh. Additionally, Paul's youth pastor told officers that the Kohs had a family agreement with Paul, which included no tolerance for drugs and allowed the Kohs to randomly test Paul for drugs. And there was also evidence that Paul had been smoking marijuana the night before he died. The forensic team told Ustich and Graf that it believed Paul's death was a homicide because, in its estimation, his injuries could not have been self-inflicted. Graf's and Ustich's superior instructed them to press Mr. Koh harder.

Ustich and Graf returned to the conference room along with Kim to continue interviewing Mr. Koh around 11:30 a.m. Graf once again offered Mr. Koh food, coffee, juice, and water. Mr. Koh responded, "Yeah, what I need is I'll let you know."[11] Graf also reminded Mr. Koh "of the rights that we read you before" and asked if he "still understood these rights and [was] willing to talk with us?" Mr. Koh responded, "Yes."[12]

As he had done throughout the entire first interview, Graf sat across the conference room table from Mr. Koh. Ustich sat on the same side as Graf and interjected with questions occasionally. Kim sat on the same side of the table as Mr. Koh to his left. Graf's questioning in this second interview was more

---

[11] Interview Tr. at 58.

[12] *Id*. at 59.

aggressive in both tone, volume, and tempo. He focused on inconsistencies between Mr. Koh's first interview and what Graf claimed had been learned through the investigation (some of the inconsistencies were real and some were created by Graf). At one point, Graf walked around the conference room table and sat next to Mr. Koh, stating, "I'm gonna move over here because I don't know if you can understand me, okay. Okay."[13] Mr. Koh turned and looked toward Kim, and Graf responded, "I just want to talk to you."[14] At that point, Mr. Koh was on the same side of the conference room table between Graf and Kim, facing toward Graf.

While Graf continued questioning Mr. Koh, he repeatedly touched Mr. Koh's arms and legs. Graf presented the theory that Mr. Koh was mad that Paul had been out doing drugs and waited for him to return home. Despite Mr. Koh's repeated denials, Graf continued to push, telling him, "We can be here for days and days and days, okay, but we don't want that."[15] During this second interview, Graf asked successive questions at a rate that precluded translation by Kim. Graf repeatedly accused Mr. Koh of lying and presented storylines about what happened, suggesting that other information that the police had gathered or would gather supported those theories. At various points, Mr. Koh was hunched over and beat his chest and head with his hands.

During both interviews, Kim either did partial or mistranslations of Mr. Koh's statements and Graf's questions, including providing a partial, but inexact, translation of Graf's

---

[13] *Id.* at 103.

[14] *Id.*, Interview Video 2 at 45:20–32.

[15] Interview Tr. at 117–18.

question about whether Mr. Koh had stabbed Paul in self-defense.[16] Also, at another point during the second interview, Kim translated literally a Korean idiom, *gachi jooka* ("let's die together"), without explaining that it was an idiom and not to be taken literally. According to the Kohs, the expression is like the English phrase, "you're killing me." Also, Kim sometimes interjected in the interview with questions in both English and Korean. Kim and Graf asked overlapping questions at times making it unclear to which question Mr. Koh was responding. For instance, at a critical point in the second interview, Graf asked Mr. Koh if he was angry. Before Mr. Koh responded to Graf's question, Kim asked Mr. Koh in Korean whether Mr. Koh acted in self-defense. Kim did not translate Graf's question. Mr. Koh responded, "I think so," prompting Kim to state, "He said it was in self-defense." As the district court correctly noted, though, it was unclear which question Mr. Koh was answering because the officers posed two, separate questions and Mr. Koh responded in a way that did not

---

[16] According to the Kohs' language expert's report, this particular exchange was as follows:

Graf: . . . was it in defense? Or was it in . .

Kim: [Korean characters] Was it self-defense?

Graf: that you were anger/angry?

Kim: [Korean characters] Did you do/engage in self-defense?

Koh: I think so yeah maybe it's a

Graf: Tell me how it happened

Kim: He said it was in defense. He said it was in defense.

Graf: I know you did it.

Koh: I did it?

Graf: You did it. Yes, didn't you?

Kim: [Korean characters] (I know you) were engaged in self-defense.

District Ct. Docket Entry 308-73 at 5.

indicate to which question he was responding. *See Koh*, 307 F. Supp. 3d at 852.

About three minutes before the second interview ended, Graf stepped out of the room to talk with another officer who had come to tell him Mr. Koh's attorney had arrived at the station. While Mr. Koh's attorney was being escorted back to the conference room, Graf increased the intensity of the interview by asking quick, successive, leading questions and leaving no time for translation. Mr. Koh responded to Graf's questioning with one or two-word responses that could be interpreted as agreeing with Graf's self-defense theory: Mr. Koh had waited up until 1 a.m. for Paul to return home, was mad that Paul was out smoking marijuana, argued with Paul upon his return, and stabbed Paul in self-defense. The interview ended when Mr. Koh's attorney came into the room a couple minutes before 1 p.m. Sometime after the interview ended, Mr. Koh was finally given his medication.

Mr. Koh was charged with murder in state court. After the trial court denied his motion to suppress his confession, the case went to trial where Mr. Koh was acquitted by a jury.[17] Prior to his acquittal, Mr. Koh spent nearly four years in the Cook County Jail.[18]

The Kohs then sued several Northbrook police officers, including Ustich and Graf, Kim, and the Villages of Northbrook and Wheeling under 42 U.S.C. § 1983. They asserted federal

---

[17] Among other evidence, Mr. Koh presented evidence at the criminal trial that Paul had committed suicide.

[18] In response to a question from the Court at oral argument, the Kohs' counsel stated that Mr. Koh was held on a $5 million bond.

constitutional claims. The Kohs set forth a Fourth Amendment claim for their arrests and a Fifth and Fourteenth Amendment claims for Mr. Koh's confession. They also brought a failure to intervene claim, a *Monell* claim against the Village of Northbrook for their unlawful detention and coercive interrogation, and a conspiracy claim. Finally, the Kohs asserted some state law claims, specifically malicious prosecution, intentional infliction of emotional distress, loss of consortium, and respondeat superior. The defendants moved for summary judgment, claiming qualified immunity. Taking the evidence and reasonable inferences in the light most favorable to the Kohs, the district court denied the motion in part and granted the motion in part. Specifically, the district court denied summary judgment on the Kohs' Fourth Amendment false arrest claims, but it held that Mr. Koh's false arrest ended when the officers had probable cause to arrest him before his second interview based on the information conveyed during the debriefing. The court also denied summary judgment on Mr. Koh's Fifth Amendment coerced confession claim, his conspiracy and failure to intervene claims (with some limitations), his municipal liability claim against the Northbrook Police Department for false arrest, and Mrs. Koh's loss of consortium claim. The court also allowed the Kohs to proceed on their respondeat superior and indemnification claims against the Northbrook and Wheeling Police departments for the surviving claims. Summary judgment was granted on Mr. Koh's state law malicious prosecution, Fourteenth Amendment substantive due process claim, due process evidence-fabrication claim, and Fourth Amendment claim based on Mr. Koh's pretrial detention.

Ustich, Graf, and Kim filed separate appeals challenging the district court's denial of summary judgment on the Kohs'

Fifth Amendment coercion claim on qualified immunity grounds.

## II.

We review a denial of qualified immunity on summary judgment *de novo*. *Lovett v. Herbert*, 907 F.3d 986, 990 (7th Cir. 2018). We are unable to review an appeal from an interlocutory order such as a denial of a motion for summary judgment, but there is an exception—the collateral order doctrine—for us to review an order denying a claim of qualified immunity. *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018). Our review, though, is limited to pure legal issues. *Id.* at 464–65. Consideration of any factual questions is outside our jurisdiction. *Hurt v. Wise*, 880 F.3d 831, 839 (7th Cir. 2018) *overruled on other grounds by Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019). For purposes of appeal, an appellant may take all facts and inferences in plaintiff's favor and argue "*those* facts fail to show a violation of clearly established law." *Id.* (emphasis in original). "When the district court concludes that factual disputes prevent the resolution of a qualified immunity defense, these conclusions represent factual determinations that cannot be disturbed in a collateral order appeal," such as this one. *Gant v. Hartman*, 924 F.3d 445, 448 (7th Cir. 2019) (internal quotation marks and citation omitted). Our review is further limited in that we may not "make conclusions about which facts the parties ultimately might be able to establish at trial, nor may [we] reconsider the district court's determination that certain genuine issues of fact exist." *Id.* (internal quotation marks and citation omitted). To establish jurisdiction, appellants must present purely legal arguments, but if those arguments "are dependent upon, and inseparable from, disputed facts," we do not have jurisdiction to consider

the appeal. *Id.* at 448–49 (quoting *White v. Gerardot*, 509 F.3d 829, 835 (7th Cir. 2007)). Finally, we will "consider[] only the facts that were knowable to the defendant officers." *White v. Pauly*, 137 S. Ct. 548, 550 (2017).

If we determine we have jurisdiction, we then turn to the qualified immunity analysis. Once an officer asserts qualified immunity, a plaintiff can proceed with his case only if he can show (1) that the "facts, taken in the light most favorable to [him], make out a violation of a constitutional right," and (2) that right was "clearly established at the time of the alleged violation." *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017) (quoting *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017)). We may consider these prongs in any order we choose. *Id.* "'If *either* inquiry is answered in the negative, the defendant official' is protected by qualified immunity." *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (citations omitted) (emphasis in original).

The parties assert various arguments. Ustich and Graf argue that the district court erred in denying their claims for qualified immunity because there was no clearly established law to alert them that their conduct at the time of Mr. Koh's interrogation was unconstitutional. Alternatively, they argue that the state trial court's denial of Mr. Koh's motion to suppress his confession was a superseding, intervening cause that entitled them to qualified immunity.

Kim also makes the "intervening cause" argument and asserts several of his own. First, he argues the facts fail to show he intended to violate Mr. Koh's right against self-incrimination and that Kim's conduct was the proximate cause of the violation of Mr. Koh's Fifth Amendment rights.  Second, Kim claims that there was no clearly established law at the time of

Mr. Koh's interview that would have given Kim notice that his conduct as a language interpreter violated Mr. Koh's Fifth Amendment rights. And third, Kim argues that the district court erred by not considering his claim for qualified immunity separately from Graf's claim.

### A.  Ustich and Graf

Turning now to Ustich and Graf's appeal, they argue they are entitled to qualified immunity because it was not clearly established in June 2009 that their conduct during Mr. Koh's interrogation was unconstitutional. While on its face this is a legal argument, we do not have jurisdiction to address it because the appellants' legal arguments "depend[] upon and [are] inseparable from disputed facts." *Gutierrez v. Kermon*, 722 F.3d 1003, 1010–11 (7th Cir. 2013). While Ustich and Graf assert in their reply brief that they have taken all of the district court's factual determinations and reasonable inferences in the light most favorable to Mr. Koh, "we detect a back-door effort to contest the facts," namely the nature of Mr. Koh's confusion and lack of understanding due to the language barrier, the impact of the lack of medication and sleep, and the threat Graf leveled against Mr. Koh. *Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011). "The voluntariness of a confession depends on the totality of the circumstances, including both the characteristics of the accused and the nature of the interrogation. If those circumstances reveal that the interrogated person's will was overborne, admitting the resulting confession violates the Fifth Amendment." *Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018) (quoting *Hurt*, 880 F.3d at 845). Had Ustich and Graf "accepted all historical facts favorably to the [Kohs] and argued that those facts did not show that [Mr. Koh's] confession was involuntary, we would be in a position to answer

the ultimate legal question." *Hurt*, 880 F.3d at 846. But since these challenged facts are an integral part of the totality of the circumstances considered by the district court, we lack jurisdiction over Ustich and Graf's appeal.

*1. The Language Barrier*

It was clear that Mr. Koh did not speak fluent English. While all the parties admit that, Ustich and Graf's characterization of the extent and effect of Mr. Koh's language barrier challenges the district court's factual determinations at summary judgment. Ustich and Graf describe Mr. Koh as having "limited English language proficiencies," but they contend that they "recruited an interpreter to eliminate or lessen the language barrier."[19] In so doing, they challenge the district court's factual determination that Mr. Koh did not just suffer from a language barrier, but rather that Mr. Koh suffered a lack of understanding and confusion and that the officers were aware of this. *Koh*, 307 F. Supp. 3d 856. Taking the facts in the light most favorable to Mr. Koh, this lack of understanding was obvious. As the district court aptly pointed out,

> Many of Mr. Koh's answers were altogether nonsensical, showing (or so a reasonable jury could find) that he did not understand what was going on. For example, Mr. Koh responded to Graf's question about what kind of person Paul was by narrating what happened yesterday morning. At another point in the interview, Koh answered a question about whether he saw a weapon by telling Graf about the tools he kept for his vending machine business. During one

[19] Ustich and Graf Appellate Br. at 24, 33.

> tense moment, Graf asked Mr. Koh[,] "Would God want Paul to [ ] have his father sitting here and telling us a story that's not true?"—a question that should obviously have been answered "no"—but Mr. Koh said "yeah." As the interview went on, Mr. Koh largely defaulted to giving one word or unintelligible answers, or responding that he did not know or could not remember.

*Id.* at 851. (citations omitted and second alteration in original). Moreover, the district court again noted that Mr. Koh's confusion was evident when Graf had more or less gotten Mr. Koh to admit that he stabbed Paul in self-defense: Mr. Koh's responses to follow-up questions made it clear that he may have been speaking about an earlier incident when Paul swung a golf club at Mr. Koh. *Id.* at 856 n.37 (quoting Interview Tr. at 136–37). The extent of Mr. Koh's understanding and the degree of his confusion are key to determining whether his confession was involuntary and coerced. Therefore, Ustich and Graf's characterization of Mr. Koh's language problem as a "limited English language proficiency" overcome by the presence of an interpreter, rather than accepting the district court's conclusions concerning Koh's lack of understanding, precludes our jurisdiction. *See Jackson*, 888 F.3d at 264 ("[D]ifferences in the parties' charaterizations of the same evidence are the essence of fact disputes, over which we presently lack jurisdiction.") (internal quotation marks omitted); *Jewett v. Anders*, 521 F.3d 818, 822 (7th Cir. 2008) (internal quotations and citations omitted) ("In reviewing a district court's denial of qualified immunity, we cannot make conclusions about which facts the parties ultimately might be able to

establish at trial. Nor may we reconsider the district court's determination that certain genuine issues of fact exist.").

Ustich and Graf's challenge regarding the impact and extent of Mr. Koh's language barrier also extends to their description of the administration of *Miranda* warnings to Mr. Koh. While they concede that Mr. Koh did not subjectively understand the warnings, their characterization of the facts surrounding the administration of the *Miranda* warnings is limited and selective. Any reasonable officer would have known at the time of Mr. Koh's interview that *Miranda* warnings are critical to protect a suspect against coercion. *United States v. Gupta*, 183 F.3d 615, 617 (7th Cir. 1999) ("Potential coercion or compulsion is vital to *Miranda*'s application, because the clause underlying its framework is the privilege against compulsory self-incrimination."). They note that Graf read Mr. Koh his rights, Mr. Koh nodded that he understood, and when Mr. Koh requested that Kim translate, Graf agreed to allow that. According to Ustich and Graf, Kim then spoke to Mr. Koh in Korean and then Mr. Koh signed the *Miranda* waiver form. A reasonable officer would have known that he could not rely upon Mr. Koh's nodding without speaking when he was first read the *Miranda* warnings after Mr. Koh asked Kim to translate. A person typically asks for something to be translated when he does not understand what was said to him in another language. When such a request is made, any prior nodding is more likely a polite acknowledgment that he was listening to what the speaker was saying rather than affirming. Ustich and Graf also leave out the important fact that Mr. Koh was going to date the written waiver form with "early in the morning," presumably that being the time Paul was found at his home. Taking this fact in the light most favorable to Mr. Koh, a reasonable officer would conclude that

Mr. Koh did not understand what he was executing when he signed the English *Miranda* waiver form. As the district court stated, Mr. Koh executed the written "*Miranda* waiver form *at Graf's and Kim's directions*." *Koh*, 307 F. Supp. 3d at 851 (emphasis added). So even if Ustich and Graf did not understand what Kim said to Mr. Koh in Korean, Mr. Koh's conduct when executing the English *Miranda* waiver form would prompt a reasonable officer to conclude that Mr. Koh did not understand what he was signing. Finally, Ustich and Graf's contention that Mr. Koh agreed at the beginning of the second interview that he was advised of his rights and understood is unavailing because it further disregards the district court's conclusions regarding Mr. Koh's lack of understanding due to the language barrier. More importantly, it presupposes that Mr. Koh understood his rights in the first instance.

### 2. Lack of Sleep and Medication

Similarly, Ustich and Graf challenge the district court's factual determinations regarding Mr. Koh's lack of sleep and medication. Both sleep and medication are relevant to the inquiry of whether an individual is susceptible to coercion. *See Greenwald v. Wisconsin*, 390 U.S. 519, 521 (1968); *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001). Regarding Mr. Koh's lack of sleep, Ustich and Graf argue Mr. Koh had slept for five hours the night prior and he did not assert he was prohibited from resting between interviews. They go on stating, "[N]o reasonable police officer would think that a person who had just lost his son in such a violent manner would want more rest, under such circumstances, before trying to help police solve the crime."[20] With such characterizations, though,

---

[20] Ustich and Graf Appellate Br. at 36.

Ustich and Graf are not taking the facts in the light most favorable to Mr. Koh and are ignoring the district court's conclusion that throughout the interviews Mr. Koh displayed signs of physical exhaustion when "he sat hunched over in his chair" and hit himself in the head and chest. *Koh*, 307 F. Supp. 3d at 837. This is a factual challenge that precludes our jurisdiction. Similarly, Ustich and Graf acknowledge that Mr. Koh did not receive his requested medication until *after* his second interview, but they argue that they did not intentionally delay providing the medicine.[21] They do not state how their intent is relevant to Mr. Koh's Fifth Amendment claim, and to the extent that it may be relevant, it is outside the scope of our jurisdiction over this interlocutory appeal. *Stinson v. Gauger*, 868 F.3d 516, 526–27 (7th Cir. 2015) (holding that the existence of intent is an issue of fact that cannot be decided on an interlocutory appeal of a denial of qualified immunity).

*3. Threatening Language*

Ustich and Graf also assert that Mr. Koh's interrogation contained no "threats of consequences."[22] This, though, is in direct contravention of the district court's factual determination that a reasonable jury could find it was a threat when Graf told Mr. Koh that they could be there for "days and days and days." *Koh*, 307 F. Supp. 3d at 853 (quoting Interview Tr. at 117). Accordingly, we do not have jurisdiction to consider Ustich and Graf's legal argument that law was not clearly established at the time of Mr. Koh's interview because this argument is "dependent upon, and inseparable from, disputed facts." *Gant*, 924 F.3d at 448.

---

[21] *Id.* at 37.

[22] *Id*. at 30

### B. Kim

Turning now to Kim's arguments, we first address his argument that there was no clearly established law in June 2009 that would have put him, a language interpreter, on notice that this conduct was unconstitutional. This argument, though, contests the district court's factual determinations about Kim's role during the interrogation and, thus, is outside of the scope of our limited jurisdiction. *See Levan v. George*, 604 F.3d 366, 370 (7th Cir. 2010) ("If the legal issue being appealed is not significantly different than the factual issues underlying the claim, this separability requirement will be nearly impossible to satisfy.") It is true that the district court addressed Kim's role as an interpreter, but Kim's argument ignores the district court's factual determination that Kim participated in the interrogation itself and did not act as a mere interpreter. *Koh*, 307 F. Supp. 3d at 852 ("Officer Kim even joined in the interrogation by asking his own questions in English. . . . Officer Kim would . . . interject in Korean with questions of his own."). At this juncture, we must take the fact that Kim participated as an interrogator during the interview as true, and Kim's characterization of his role in the interrogation as a mere interpreter challenges that fact in such a way that precludes our jurisdiction. We are unable to address his purported legal claim because it is entangled with the factual question of his role during Mr. Koh's interview. *See Hill v. Coppleson*, 627 F.3d 601, 605–06 (7th Cir. 2010) (holding that a prosecutor was not entitled to absolute or qualified immunity because the "resolution depends on facts that the district court has properly determined to be in dispute").

Further, in light of the district court's factual determination about Kim's participation in the interview, the district court did not err in attributing to Kim a shared knowledge with Graf of the facts and circumstances of the interrogation. Kim argues that the attribution demonstrates that the district court failed to assess his entitlement to qualified immunity independently of its assessment of Graf's qualified immunity claim. While the district court's individual assessment of Kim's entitlement to qualified immunity was brief, given that Kim participated in the same, singular factual scenario as Graf, i.e., Mr. Koh's interrogation, the district court satisfied the individualized determination required when it concluded that Kim was not entitled to qualified immunity. This is particularly true given the district court's determination that Kim participated in the interrogation by posing questions of his own and not merely as a language interpreter. *Cf. Estate of Williams v. Cline*, 902 F.3d 643, 651–52 (7th Cir. 2018) (holding that the district court did not conduct the requisite individualized determination of officers' entitlement to qualified immunity on plaintiff's Fourth Amendment claim where officers had varying encounters with plaintiff at different times).

Kim further argues that had the district court made the appropriate individualized determination "it would have found [he] lacked requisite intent to coerce a confession from Koh in violation of the Fifth Amendment's self-incrimination clause."[23] Like Ustich and Graf, Kim has failed to assert how his intent is relevant to Mr. Koh's legal claim and to the extent that it may be relevant, such a contention is a factual question over which we do not have jurisdiction. *Stinson*, 868 F.3d at 526–27. Kim's argument regarding intent also permeates his

---

[23] Kim Reply Br. at 17–18.

challenge of the district court's factual determination regarding the translations that he provided, namely the summary of the *Miranda* warnings, the Korean idiom *gachi jookja*, and other translational errors. He contends he "acted to the best of his ability" and had no intention to deceive or coerce Koh's confession.[24] Again, such an argument is outside the scope of our limited jurisdiction at this juncture.

### C.  Superseding, Intervening Cause

All three appellants contend that the state trial court's denial of Mr. Koh's motion to suppress is a superseding, intervening cause entitling them to qualified immunity. We do not have jurisdiction over the argument asserted by all appellants that the state court's denial of Mr. Koh's motion to suppress is a superseding, intervening cause of his Fifth Amendment claim. As we held in *Jackson*, 888 F.3d at 266, this court has not "accepted this argument in the context of a Fifth Amendment coerced-confession claim," and since the "superseding-cause issue . . . is not a pure legal question related to qualified immunity," the court lacks jurisdiction under the collateral order doctrine.

III.

Because these appeals present factual challenges that are outside of our jurisdiction over an appeal of an order denying qualified immunity on summary judgment, we dismiss these appeals for lack of jurisdiction.

---

[24] Kim Appellant Br. at 20.