In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 20-1681

FERNANDO LOPEZ,

*Plaintiff-Appellant,*

*v.*

SHERIFF OF COOK COUNTY, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16 C 10931 — **Edmond E. Chang**, *Judge.*

———————————

ARGUED DECEMBER 4, 2020 — DECIDED APRIL 9, 2021

———————————

Before KANNE, WOOD, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Nothing much good happens after 3:00 a.m. The early morning hours of November 30, 2014 outside the Funky Buddha Lounge on Chicago's West Side were no different. That morning, upon hearing a gunshot, Officer Michael Raines, an off-duty Cook County correctional officer out celebrating a friend's birthday, approached the scene of a scuffle between patrons outside the Lounge. Fernando Lopez was present and pulled a gun, firing two shots into the air.

Having seen Lopez fire near people on a crowded street, Officer Raines confronted and shot Lopez multiple times in the span of three seconds. Lopez reacted by dropping his gun and scampering toward the sidewalk outside the bar. Just as Raines began to chase after him, Lopez's friend Mario Orta picked up the dropped gun and fired at Raines—but missed. Officer Raines then used Lopez as a human shield in a standoff with Orta for several minutes until Orta fled. The scene was chaotic and everything happened fast.

Lopez survived and brought a civil rights suit alleging Officer Raines used excessive force against him in violation of the Fourth Amendment. The district court granted summary judgment for the defendants, concluding that Officer Raines was entitled to qualified immunity because his use of deadly force did not violate clearly established law. We affirm, though not without the same pause expressed by the district court. Our review of the record, including video footage of the events, leaves us with the impression that although the circumstances were volatile, Officer Raines may have been able to avoid any use of lethal force. We cannot conclude, however, that his decision to the contrary violated clearly established law.

**I**

A

Our retelling of the facts tracks the district court's meticulous recitation at summary judgment. We view all facts in the light most favorable to Lopez as the nonmovant and draw all reasonable inferences in his favor. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We may also take stock of what the video evidence shows without favoring

Lopez where the video contradicts his view of the facts. See *Scott v. Harris*, 550 U.S. 372, 378–81 (2007); *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018).

Security camera timestamps show that at about 3:55 a.m. on November 30, 2014, many people were loitering outside the Funky Buddha Lounge. Fernando Lopez was driving a group of his friends westbound on Grand Avenue when he sideswiped an SUV parked in front of the Lounge. A group of bystanders saw this and reacted by swarming Lopez's car and grabbing and punching at him through an open window. The already tense situation then escalated.

One of the passengers exited Lopez's car, displayed a handgun, and fired a warning shot into the air. Lopez also got out of the car, grabbed the passenger's gun, and waved it around in the air—presumably to scare off the group that had encircled his car. Lopez then walked toward a few of the men in the now-dispersed group, crossing the street and alternating between pointing the gun at them and up in the air as if to tell everyone not to mess with him.

While all of this unfolded, Michael Raines, a correctional officer with the Cook County Sheriff's Office who had been out celebrating a friend's birthday, arrived on the scene at 3:56:11 a.m., likely after hearing the initial gunshot from a nearby bar. The video footage shows Raines running onto Grand Avenue, at an intersection not more than a few car lengths from where Lopez stood. Just a few seconds after Raines came onto the scene, Lopez turned away from his fleeing attackers and walked back toward his car. While doing so, he stopped in the middle of the street and fired two shots at an upward angle in the general direction of a few fleeing

Lounge-goers. Officer Raines then approached Lopez with his own gun drawn.

It was now 3:56:22 a.m. Raines and Lopez walked toward each other—both visibly armed—though it was not clear whether Lopez had seen Raines by this point. Lopez waved his gun up and down, though he does not appear to have aimed directly at Officer Raines. For his part, Raines had his gun aimed at Lopez. Lopez then reached to open his car door, but Raines started shooting before he could get inside the car (at about 3:56:27 a.m.). Lopez—hit by at least one bullet— turned, dropped his gun, and started to stagger away. Raines stayed focused on Lopez and continued to fire for two more seconds, stopping at 3:56:30 a.m. All told, Raines appears to have fired six rounds in three seconds.

Injured but still standing, Lopez then ran around the back of his car, eventually reaching the sidewalk right outside the Lounge at about 3:56:32 a.m. Officer Raines kept pursuing Lopez, who was holding himself up by leaning against the Lounge's wall. As Raines followed and approached Lopez, Mario Orta, a passenger in Lopez's car, picked up the dropped gun and almost immediately fired a shot directly at Officer Raines (at about 3:56:32 a.m.). The shot missed. Raines reached Lopez along the Lounge's exterior wall just two seconds later.

What followed was bizarre and dangerous—but it all happened and was captured on several security cameras. Video footage from one of the cameras may be accessed at https://www.chicagotribune.com/news/breaking/ct-funky-buddha-gunfight-sentencing-20170725-story.html. For about three and a half minutes, Mario Orta (Lopez's friend) and Officer Raines engaged in a protracted standoff with guns

pointed at one another. At several points in the standoff, Orta circled Raines, getting as close as a couple of feet away from him. Throughout the standoff with Orta, Raines simultaneously restrained Lopez—now wounded, but conscious—and used him as a human shield to prevent Orta from getting a clean shot. At one point, Orta entered the Lounge, seemingly looking for another route to approach Raines. Orta eventually reemerged from the Lounge's front entrance at 3:56:54 a.m. and aimed his gun squarely at Raines. Orta started to walk off, but then again approached Raines at 3:57:13 a.m. During this confrontation, Officer Raines alternated between holding the gun at Lopez's head, using it to wave off bystanders who tried to diffuse the situation, and pointing his gun straight at Orta. Lopez, injured but still alert, repeatedly swatted at Raines's gun in an effort to dislodge it.

At about 4:00:10 a.m., less than five minutes after events began with an errant car sideswipe, Orta fled the scene. That no one died during the chaotic melee is astonishing.

B

Police and paramedics soon arrived at the scene. Lopez survived and later faced criminal charges in Cook County, where he pleaded guilty to a state law firearms offense. See 720 ILCS 5/24-1.2(a)(2) (defining and criminalizing the aggravated discharge of a firearm). He also brought suit in federal court under 42 U.S.C. § 1983 against Officer Raines (and now that Raines has since passed away, against his special representative), the Sheriff of Cook County, and Cook County. Lopez alleged that Raines used excessive force in violation of the Fourth Amendment. He also brought a related *Monell* liability claim against Cook County.

The defendants moved for summary judgment, contending that Officer Raines did not use excessive force and that Lopez's § 1983 action was barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), on the view that the claim necessarily undermines the validity of Lopez's conviction in Cook County. The defendants further argued that Officer Raines was entitled to qualified immunity regardless of the merits of the excessive force claim. While Lopez disputed whether qualified immunity applied to Raines's specific conduct, he did not contend that Officer Raines was ineligible to assert the defense on the basis that the challenged conduct occurred while Raines was off duty. Doing otherwise would have undermined the basis for Lopez's § 1983 suit, which requires that a defendant act "under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Our case law also makes plain that Raines's conduct, even though off duty, could constitute state action. See *Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1995) ("Deciding whether a police officer acted under color of state law should turn largely on the nature of the specific acts the police officer performed, rather than on merely whether he was actively assigned at the moment to the performance of police duties.").

The district court entered summary judgment for the defendants, concluding that even though Lopez's suit was not *Heck*-barred, Officer Raines was entitled to qualified immunity. That determination, the district court observed, meant that the rest of Lopez's claims necessarily failed.

The district court chose to proceed first to the second prong of the qualified immunity analysis—whether Officer Raines violated clearly established law. See *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (concluding that judges may

exercise "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). While emphasizing that Raines's conduct is open to criticism, the district court explained that the law affords police officers significant deference in making snap decisions in the heat of the moment, with officers losing the benefit of qualified immunity only when they violate clearly established law. Officer Raines, the district court observed, heard a gunshot, responded, and then saw Lopez fire a weapon around a group of people standing outside and near the Funky Buddha Lounge. The court further observed that after shooting Lopez, Raines was fired upon and subsequently engaged in a prolonged standoff with an armed assailant while trying to subdue an injured-but-resisting Lopez. With these unique and fast-moving facts front of mind, the district court concluded that Officer Raines did not violate clearly established law and was therefore entitled to qualified immunity.

Lopez now appeals.

## II

We first consider the defendants' argument that *Heck v. Humphrey* bars Lopez's § 1983 claim. This contention is way off the mark.

A prisoner cannot seek damages against a governmental entity for a violation of his constitutional rights when a judgment in the prisoner's favor "would necessarily imply the invalidity of his conviction or sentence." *Heck*, 512 U.S. at 486–87. Allowing Lopez's excessive force claim to proceed, the defendants contend, implies the invalidity of Lopez's conviction for discharging a firearm. We agree with the district court that Lopez's conviction does not bar his § 1983 suit because

success on the Fourth Amendment excessive force claim does not depend on any fact undermining or implying the invalidity of the state law conviction.

Lopez pleaded guilty to aggravated discharge of a firearm, which requires a person to knowingly or intentionally fire in the direction of another person. See 720 ILCS 5/24-1.2(a)(2). Under Illinois law, however, a person can be found guilty of that offense without posing a threat of serious harm to another. See *People v. Ellis*, 929 N.E.2d 1245, 1248–49 (Ill. App. Ct. 2010). This means Lopez can be guilty of aggravated discharge of a firearm while also having had excessive force used against him by an officer after the fact. These two realities are not mutually exclusive. So *Heck* does not bar Lopez's § 1983 claim.

## III

### A

We come now to the district court's grant of qualified immunity. The doctrine of qualified immunity balances dueling interests—allowing officials to perform their duties reasonably without fear of liability on the one hand and "affording members of the public the ability to vindicate constitutional violations by government officials who abuse their offices" on the other. See *Weinmann v. McClone*, 787 F.3d 444, 447–48 (7th Cir. 2015) (cleaned up). In evaluating a law enforcement officer's entitlement to qualified immunity, we undertake the twofold inquiry of asking whether his conduct violated a constitutional right and, if so, whether that right was clearly established at the time of the alleged violation. See *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). We may choose which prong to address first. See *Pearson*, 555 U.S. at 236.

Like the district court, we begin and end with the second step of the analysis: determining whether Officer Raines violated Fernando Lopez's clearly established Fourth Amendment right to be free from an unreasonable seizure. For the law to be clearly established, the "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Assessing whether an officer used excessive force turns on whether the officer's actions are "objectively reasonable in light of the facts and circumstances confronting [the officer]." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation omitted). We must consider, too, "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.

This context-specific inquiry notwithstanding, it is firmly established that a "person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force." *Strand v. Minchuk*, 910 F.3d 909, 915 (7th Cir. 2018) (quoting *Weinmann*, 787 F.3d at 448); see also *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985). But these situations are fluid. While an officer may be authorized to use deadly force at one moment, it is not a blank check. When an individual has become "subdued and [is] complying with the officer's orders," the officer may no longer use deadly force. *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009). Yet we must be careful not to allow the benefit of hindsight to cause us to discount the reality

that officers must make quick decisions as to how much force, if any, to employ. See *Graham*, 490 U.S. at 396–97.

While cases like *Garner* and *Graham* are instructive in the excessive force context, they "do not by themselves create clearly established law outside an obvious case." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (internal citations omitted). Determining whether an officer violates clearly established law requires a look at past cases with specificity. See *id.* at 1152–53. The Supreme Court has time and again instructed lower courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *al-Kidd*, 563 U.S. at 742). Specificity is critical to making qualified immunity a workable doctrine in the Fourth Amendment context, where it "is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* at 308.

But this requirement is not unbending. The prong-two clearly-established-law assessment does not require a case with identical factual circumstances, lest qualified immunity become absolute immunity. See *Kisela*, 138 S. Ct. at 1152. Still, the right must be so clearly established such that it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (cleaned up). That sounds like a high bar because it is—qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

B

The district court approached this inquiry the exact right way, looking first to past precedent to ask whether any cases

squarely govern the facts at issue. In following suit, we too think it best to consider Officer Raines's use of force that early morning in two distinct phases: the shooting of Lopez and the use of Lopez as a human shield during the sidewalk standoff.

Recall the scene when Officer Raines arrived. It was just before 4 a.m. when Raines heard a gunshot from a nearby bar and ran to Grand Avenue, where he saw Fernando Lopez fire two shots into the air, in close proximity to the scattering crowd outside the Funky Buddha Lounge. Lopez then turned in Raines's direction and began walking toward him, all the while displaying and waving a gun.

Though we have tried our best to describe the incident, a picture is worth a thousand words.



This still image of security camera video footage shows the positioning and proximity of Lopez (indicated by a triangle) and Officer Raines (circled) when Lopez, while standing in

the middle of Grand Avenue, fired twice into the air at 3:56:20 a.m.

Neither the Supreme Court's precedent nor our own clearly establishes that Officer Raines's split-second decision to open fire was unlawful. There were many people on the city street when Lopez, just moments before, opened fire. All Raines knew at the time he fired was that Lopez had just popped off two rounds and that Lopez was now walking in his general direction with gun in hand. A reasonable officer could have concluded that Lopez was an imminent threat both to the officer and the bystanders on the street and outside the Lounge.

Lopez insists that Officer Raines should have given him a warning. Whether Raines did so is disputed. At summary judgment and without any clear evidence to the contrary, we must credit Lopez's contention that Raines did not announce himself as a police officer. A warning is decidedly preferred — but it is not required in every circumstance. See *Pobjecky*, 883 F.3d at 952 ("*Garner* requires an officer to warn 'where feasible' but does not require an officer to warn under all circumstances."). Given the lack of clearly established law, Officer Raines is entitled to qualified immunity as to the first shot. From here the case gets much harder.

Lopez contends that even if the first shot did not transgress established law, Raines's subsequent shots clearly violated Lopez's constitutional right not to have lethal force used against him once he was subdued by the initial shot. But that contention too discounts the speed and unpredictability with which events unfolded on the street that morning. As the district court explained, the video shows that Raines first shot Lopez at 3:56:27 a.m. Lopez dropped his gun one second later,

but as he turned and started to run, Officer Raines fired for two more seconds, until 3:56:30 a.m. Raines fired all of his shots in the span of three seconds.

In retrospect, and with the benefit of the security footage, it is inviting to parse the multiple shots fired into separate individual events. But we must consider them together in light of how quickly—and in precisely what circumstances—everything transpired. Indeed, in this very context of qualified immunity, the Supreme Court has emphasized that a proper analysis must "allo[w] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014) (alteration in original) (quoting *Graham*, 490 U.S. at 396–97). Lopez cannot point to a case that clearly establishes a reasonable officer cannot use lethal force over the span of three seconds on an individual he had just seen fire his weapon, who has not surrendered, and is still moving to evade capture.

Lopez points to precedent that we find either easily distinguishable or standing for principles that do not show that Officer Raines's conduct violated clearly established law. Consider, for instance, our decision in *Ellis v. Wynalda*, 999 F.2d 243 (7th Cir. 1993). *Wynalda* clearly establishes only that "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Id*. at 247. That general proposition is clear, but it does not change our analysis of Officer Raines's specific conduct. *Wynalda* is different because the victim there was shot in the back while fleeing and did not have a gun—unlike Lopez, who was armed, had just fired at least two shots

on a populated city street, and was walking in the direction of an officer while displaying a gun.

Nor does *Sledd v. Lindsay*, 102 F.3d 282 (7th Cir. 1996), defeat qualified immunity for Officer Raines. In *Sledd*, we reversed a grant of qualified immunity because there were numerous disputed questions of material fact that were, incidentally, unaided by any video footage. See *id*. at 284. Even more significant, Andrew Sledd was shot in his own home after police executed a disputed no-knock warrant—and crucially, Sledd had not fired any shots in front of police. See *id*. at 286. The shooting of Lopez, by contrast, happened on a crowded city street only after Officer Raines saw Lopez fire shots and walk toward him displaying the gun. Not only are these cases distinguishable, but there is also recent precedent with facts that more closely resemble the situation here.

Just two years ago, we held that an off-duty police officer—who did not announce himself—acted reasonably when he shot and killed an unarmed, fleeing suspect at a pizza parlor. See *Pobjecky*, 883 F.3d at 946. That case, while not on all fours with the circumstances here, does lend support to the district court's conclusion that Officer Raines did not violate clearly established law. At the very least, *Pobjecky* does not "place[ ] the invalidity of [Raines's conduct] beyond debate." *Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019).

## C

Our assessment does not change when we consider Officer Raines's conduct on the sidewalk. Recall that after Raines shot Lopez, Lopez quickly moved around the rear of his car and scampered toward the sidewalk. Security footage shows Lopez dropped his gun but was still fleeing. Raines followed

after him, quickly reaching Lopez on the sidewalk near the entrance to the Lounge just a few seconds later (at 3:56:34 a.m.). As Officer Raines followed after Lopez, Mario Orta picked up Lopez's gun and immediately opened fire on Raines—shooting directly at him but missing. Raines was then forced to deal with two assailants—restraining an injured Lopez and keeping a mobile, gun-toting Orta at bay. Notice what Officer Raines did not do: he never again fired his weapon. He instead used Lopez's body as a buffer between himself and Orta, rotating his position (and the injured Lopez) to react to Orta's constant movement. Here, too, a picture may again clarify the scene.



This still image of security camera video footage shows one snippet of the sidewalk standoff between Orta (indicated by a rectangle) and Raines (circled) at 3:57:15 a.m. The picture shows what we mean when we say that Officer Raines used Lopez as a human shield.

To be sure, Raines aggressively restrained Lopez, at times holding a gun to his head. You certainly (and rightly) will not find this maneuver in a police training manual. But the qualified immunity inquiry is not whether Officer Raines's action is immune from criticism. The question the Supreme Court instructs courts to consider instead is whether Officer Raines violated clearly established law. In our view, he did not.

Putting a gun to someone's head is no doubt a use of force. See *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000). And the use of such force is unreasonable when the suspect is subdued and complying with orders. See *Johnson*, 576 F.3d at 660. But Lopez was neither incapacitated nor complying with orders. He was actively trying to swat Officer Raines's gun away as Raines tried to fend off an armed and dangerous Orta. By the district court's count, Lopez did this more than 17 times while Orta aimed his gun squarely at Raines.

The combination of these unusual facts compels our conclusion. We cannot say that Officer Raines's actions on the sidewalk violated law clearly established in 2014—especially when considering the Supreme Court's admonition to define the violation with specificity. Try as Lopez might, there is no analogous case to put Raines on notice that his conduct was unlawful given the circumstances he faced in those early morning hours.

Nor is this a situation where a violation is so egregious that any reasonable officer would know they are violating the Constitution notwithstanding the lack of an analogous decision. See *Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020); *Hope v. Pelzer*, 536 U.S. 730, 740–42 (2002); *Estate of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010) ("[The] conduct was so patently violative of the constitutional right that reasonable

officials would know without guidance from a court."). The situation was too fast-moving, too unpredictable, and too volatile to reach that conclusion. Raines could have reasonably concluded he was acting lawfully in protecting himself and the public when he subdued Lopez and tried to defuse the situation by using him as a shield to ward off Mario Orta until police arrived at the scene.

## IV

What makes this case difficult is the distinct impression the video leaves us with after watching it multiples times. By the looks of it, there is a reasonable chance that Fernando Lopez was about to get in his car and leave the scene right when Officer Raines opened fire. That observation invites the conclusion that Raines may not have needed to use lethal force at all. This whole situation may have been avoided had cooler heads prevailed that morning.

Hindsight—aided by watching this scene unfold frame by frame on video footage from four distinct angles in the comfort of the courthouse—allows us to ponder how Officer Raines could have best handled the situation. But that is not our inquiry here. We are left to evaluate whether Raines's conduct violated clearly established law, given the dangerous, delicate, and dynamic circumstances he faced that morning and the state of the law at the time. The benefit of hindsight does not lower the clear and high bar that is the law of qualified immunity. In this case that bar compels us to AFFIRM the grant of qualified immunity.