In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 24-1292

WILLIAM MANERY,

*Plaintiff-Appellee,*

*v.*

JASON LEE,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:22-cv-00239 — **Sarah Evans Barker**, *Judge.*

———————————

ARGUED OCTOBER 31, 2024 — DECIDED JANUARY 7, 2025

———————————

Before SYKES, *Chief Judge*, and RIPPLE and LEE, *Circuit Judges*.

RIPPLE, *Circuit Judge*. William Manery first brought this action under 42 U.S.C. § 1983 in Indiana state court against Lieutenant Jason Lee and other defendants. He alleged that Lieutenant Lee impermissibly employed deadly force in violation of the Fourth Amendment, as made applicable to the states

through the Fourteenth Amendment.[1] The defendants re-
moved the case to the United States District Court for the
Southern District of Indiana.[2] Lieutenant Lee later moved for
summary judgment, asserting that he was entitled to quali-
fied immunity. The district court denied the motion because
it believed that genuine issues of material fact remained.

Lieutenant Lee now appeals that determination. He ar-
gues, accepting the facts in the light most favorable to
Mr. Manery, that he is nevertheless entitled to qualified im-
munity. We agree. Accordingly, the judgment of the district
court is reversed, and the case is remanded to the district
court for proceedings consistent with this opinion.

# I

## BACKGROUND

### A.

On April 10, 2021, at approximately 3:36 p.m., Lieutenant
Lee, a reserve deputy sheriff for the Marion County Sheriff's
Office, heard a dispatch request to execute an out-of-state ar-
rest warrant for Mr. Manery from Rutherford County, Ten-
nessee. The Rutherford County Sheriff's Office had tracked
Mr. Manery to Broad Ripple, Indiana. According to the Ten-
nessee warrant, authorities in that state wanted Mr. Manery
for aggravated assault with a vehicle, evasion of arrest, and
violation of probation. The dispatch relayed these warrants

---

[1] *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

[2] The district court's jurisdiction was predicated on 28 U.S.C. §§ 1331 and
1343.

and noted that Mr. Manery might be armed,[3] was a flight risk, and had previously threatened "suicide by cop."[4] Lieutenant Lee joined the warrant team, which also included other officers from the Marion County Sheriff's Office: Sergeant James Russo, K-9 Corporal Erik Stojkovich (and his K-9), and Deputies Sean White, Scott Craig, and Brandon Wilcox.

The team proceeded to an apartment complex in Broad Ripple where, according to information received from Tennessee authorities, they would find Mr. Manery. In the parking lot, the team discovered the Jeep that the Tennessee authorities suspected Mr. Manery was driving. Deputy White and Lieutenant Lee parked their vehicles on either side of the Jeep to block it. Deputy White approached the driver's side of the Jeep while Lieutenant Lee approached the passenger's side.[5] They found Mr. Manery sleeping in the car. With his service revolver and flashlight drawn, Deputy White woke Mr. Manery by yelling repeatedly, "Show me your hands" and "Do not move."[6] Lieutenant Lee struck the passenger window with his service revolver. Mr. Manery put his hands in and out of his pockets, then started the Jeep. He placed the Jeep in reverse and, despite hitting Deputy White's car, continued to reverse. Lieutenant Lee pursued him on foot. The

---

[3] Mr. Manery turned out to be unarmed, but Lieutenant Lee was not aware that the information provided by dispatch was incorrect at the time.

[4] R.57-2 at 1.

[5] Two videos captured the encounter. At summary judgment, we view the facts in the light most favorable to the nonmovant but can rely on clear and conclusive videos if they "firmly settle[] a factual issue." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018).

[6] R.48-5 (Hickman Video).

Jeep hit a curb, stopped briefly, and then moved forward. In this forward trajectory, the Jeep then hit Deputy Wilcox's car. Within seconds of the collision, Lieutenant Lee opened fire. He fired five shots, paused briefly, then fired four more through the driver's side door. He hit Mr. Manery in the arm, hip, chest, and stomach. The entire encounter unfolded in less than a minute.

**B.**

Mr. Manery initiated this action in state court against Lieutenant Lee, the Marion County Sheriff's Office, and the Consolidated City of Indianapolis and Marion County. He alleged that Lieutenant Lee's use of deadly force had violated his Fourth Amendment rights. He also pleaded excessive force, negligence claims under state law, and a *Monell* claim against the Sheriff's Office and the City, alleging that these entities had failed to train adequately their law enforcement officers.[7]

The defendants removed the case to the district court, and Lieutenant Lee filed a summary judgment motion in which he submitted that he was entitled to qualified immunity.[8] The district court denied his request. It acknowledged that, at the time of the encounter, Lieutenant Lee knew that Mr. Manery was wanted for aggravated assault with a vehicle and other crimes. The court further acknowledged that Lieutenant Lee reasonably believed that Mr. Manery was armed and

---

[7] The district court granted summary judgment to the Marion County Sheriff's Office on Mr. Manery's failure to train claim, and Mr. Manery conceded that his case against the City could not proceed.

[8] Lieutenant Lee also asserted that he was entitled to summary judgment on the state law negligence claim. The district court granted him summary judgment on this claim.

previously had threatened "suicide by cop." However, in the court's view, genuine issues of material fact remained, precluding summary judgment.[9] The court expressed concern that deadly force may no longer have been justified once Mr. Manery hit Deputy Wilcox's car. Addressing the requirements of qualified immunity, the court first assumed without deciding that Lieutenant Lee had violated Mr. Manery's constitutional rights. It then concluded that the inquiry into whether the law was clearly established was "intertwined with factual disputes concerning threat level" at the time Lieutenant Lee discharged his revolver.[10] These factual disputes, concluded the district court, had to be resolved by the jury.

Lieutenant Lee then filed this interlocutory appeal seeking review of the district court's denial of qualified immunity, an issue that we review de novo. *See Smith v. Finkley*, 10 F.4th 725, 734 (7th Cir. 2021).

## II

## DISCUSSION

### A.

As a general matter, our appellate jurisdiction is limited to "final decisions of the district courts." 28 U.S.C. § 1291.

---

[9] In the district court, Lieutenant Lee submitted that, when he decided to fire, Mr. Manery was driving straight toward him. Disputing this assertion, Mr. Manery contended that his vehicle was blocked by Deputy Wilcox's car and that Lieutenant Lee had moved to the side of the vehicle before he fired.

[10] *Manery v. Lee*, No. 22-cv-00239, 2024 WL 518132, at *10 (S.D. Ind. Feb. 9, 2024) (quoting *Smith v. Finkley*, 10 F.4th 725, 749 (7th Cir. 2021)).

However, the decisions of the Supreme Court and this court establish that, as an exception to this rule, an official who is denied the protection of qualified immunity in the district court may seek immediate review in the court of appeals. *See Mitchell v. Forsyth*, 472 U.S. 511, 528–30 (1985). That said, "a qualified-immunity appeal must focus exclusively on legal questions about immunity, rather than factual disputes tied up with the merits of the case." *Jones v. Clark*, 630 F.3d 677, 679 (7th Cir. 2011) (citing *Mitchell*, 472 U.S. at 527–30).[11] To determine whether our appellate jurisdiction is secure, we first ask whether the district court denied qualified immunity because factual disputes existed. *Finkley*, 10 F.4th at 736. We then consider whether the party seeking qualified immunity adopts the plaintiff's version of the facts as true for purposes of his appeal, or instead makes a "back-door effort" to use disputed facts. *Id.* As we have noted earlier, the district court denied qualified immunity because factual disputes existed. Lieutenant Lee maintains, however, that our jurisdiction is secure because he "accepts those disputed facts as true for purposes of this appeal."[12]

"A district court's finding that there are genuine issues of material fact 'does not always preclude appellate review.'" *Gutierrez v. Kermon*, 722 F.3d 1003, 1009 (7th Cir. 2013) (quoting *Sallenger v. Oakes*, 473 F.3d 731, 738 (7th Cir. 2007)). Where, as here, the defendant "accept[s] the district court's view that there are factual disputes but take[s] each disputed fact in the light most favorable to the plaintiff," he may still immediately

---

[11] *See also Finkley*, 10 F.4th at 735–36.

[12] Appellant's Reply Br. 2.

appeal. *Jones*, 630 F.3d at 680.[13] Given Lieutenant Lee's acceptance of Mr. Manery's version of the facts, we turn to the merits of his qualified immunity defense, construing all the facts in Mr. Manery's favor. *See id.* ("In a collateral-order appeal like this one, where the defendants say that they accept the plaintiff's version of the facts, we will take them at their word and consider their legal arguments in that light.").

**B.**

"A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment and accordingly must be reasonable." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). Determining whether the force used to effect a seizure is reasonable requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quotation marks omitted) (quoting *Garner*, 471 U.S. at 8). A court must consider the severity of the underlying crime, whether the suspect posed an immediate threat to the officers' or others' safety,

---

[13] *See also Viilo v. Eyre*, 547 F.3d 707, 711 (7th Cir. 2008) ("[R]ulings remain appealable where the defendant appeals the denial of qualified immunity on the basis of stipulated facts, on the facts as alleged by the plaintiffs or on the facts the district court deems sufficiently supported to create jury issues."); *Sain v. Wood*, 512 F.3d 886, 891 (7th Cir. 2008) (exercising appellate jurisdiction because defendant seeking qualified immunity accepted plaintiff's version of the facts); *Knox v. Smith*, 342 F.3d 651, 656–57 (7th Cir. 2003) (same); *Sallenger v. Oakes*, 473 F.3d 731, 738–39 (7th Cir. 2007) (exercising appellate jurisdiction because defendants accepted the district court's version of the facts); *Coady v. Steil*, 187 F.3d 727, 730–31 (7th Cir. 1999) (exercising appellate jurisdiction to review legal but not factual disputes).

and whether the suspect was resisting arrest or fleeing. *See id.* (citing *Garner*, 471 U.S. at 8–9). "Deadly force may be used if the officer has probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm' and is about to escape." *Muhammed*, 316 F.3d at 683 (quoting *Garner*, 471 U.S. at 11–12).

We assess the totality of the circumstances "from the 'perspective of a reasonable officer on the scene,'" not with the benefit of hindsight. *Id.* (quoting *Graham*, 490 U.S. at 396). To do so, we must consider "the information known to the officer at the time of the encounter; the duration of the encounter; the level of duress involved; 'and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances.'" *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020) (first quoting *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018); and then citing *Graham*, 490 U.S. at 396–97). We must remember that field encounters often require law enforcement officers to make split-second decisions in quickly unfolding, highly stressful situations.

## C.

Lieutenant Lee has raised a defense of qualified immunity, which shields "government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Weinmann v. McClone*, 787 F.3d 444, 447 (7th Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity protects public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow*, 457 U.S. at 806.

Just as importantly in this case, the doctrine gives officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

An official will be protected by qualified immunity "unless the plaintiff shows: '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017) (quoting *al-Kidd*, 563 U.S. at 735). At one time, Supreme Court precedent required lower courts to treat the constitutional issue as a threshold inquiry. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Today, however, these questions may be addressed in either order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Considering the constitutional question first "is often beneficial," in part because it "promotes the development of constitutional precedent." *Id.*; *see also Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014). Such an approach also can promote the stability and clarity of constitutional precedent. *See Camreta v. Greene*, 563 U.S. 692, 705–06 (2011). On the other hand, some constitutional standards require, by their nature, very fact-specific assessments conducted at a significant degree of specificity. In such cases, prudential concerns often counsel that we focus on the second prong. *See Pearson*, 555 U.S. at 237; *see also, e.g., Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 987 (7th Cir. 2021); *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018); *Finkley*, 10 F.4th at 755–57 (Sykes, C.J., dissenting).

The second prong of the qualified immunity analysis ensures that a government official is held liable only when the contours of the right allegedly violated are "sufficiently definite that any reasonable official in the defendant's shoes

would have understood that he was violating it." *Plumhoff*, 572 U.S. at 778–79. In the context of excessive force claims, a plaintiff can meet "this burden either by identifying a 'closely analogous case that established a right to be free from the type of force the police officers used on him' or by showing 'that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment.'" *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (quoting *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008)). Although a plaintiff need not put forth "a case directly on point," settled authority "must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Furthermore, the constitutional right at issue must not be defined at too high a level of generality. *See Plumhoff*, 572 U.S. at 779.

## D.

With these principles in mind, we turn to the record before us. Mr. Manery contends that it was clearly established that "deadly force cannot be used when there is no longer an imminent threat of danger."[14] In doing so, he defines the constitutional right at too high a level of generality. *See id.*; *Brumitt v. Smith*, 102 F.4th 444, 448 (7th Cir. 2024) ("[F]raming the right as the right to be free from force once subdued is impermissibly broad."). "[S]pecificity is especially important in the Fourth Amendment context" because "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)

---

[14] Appellee's Br. 32.

(per curiam) (alteration in original) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)). Because the inquiry into whether an officer used excessive force is highly fact-dependent, "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id.* (quoting *Mullenix*, 577 U.S. at 13).

The cases to which Mr. Manery invites our attention, including *Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003), and *Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993), do not squarely govern the specific facts at issue. *See Kisela*, 584 U.S. at 104; *Findlay*, 722 F.3d at 899–900. In *Scott*, a suspect reversed his vehicle toward an officer, then began to drive away. *See Scott*, 346 F.3d at 754. The precise moment at which the officer shot was unclear, but we determined that the officer's claim of self-defense "would be significantly weakened" if he fired while the suspect was driving away. *Id.* at 757–58. In *Starks*, a suspect attempting to flee reversed to maneuver around a utility pole. *See Starks*, 5 F.3d at 232. He then drove forward, after which point an officer jumped in front of the quickly moving vehicle and opened fire. We held that if the officer "unreasonably created the encounter that ostensibly permitted the use of deadly force to protect him," then his use of force was unreasonable. *Id.* at 234. Unlike *Scott*, Mr. Manery does not maintain that he was driving away from Lieutenant Lee when Lieutenant Lee fired, but that his vehicle had come to a stop. And unlike *Starks*, Lieutenant Lee did not create the danger that permitted his use of force; he pursued a reversing car that then began to drive forward. And, far from jumping in that vehicle's path, he moved to the side. These cases are not sufficiently analogous to Lieutenant Lee's encounter with Mr. Manery and therefore are not an impediment to the grant of qualified immunity. *See Kisela*, 584 U.S. at 104.

Mr. Manery relies on additional cases[15] to support his contention that it was clearly established that an officer may not use deadly force once the threat has diminished. In *Strand v. Minchuk*, 910 F.3d 909 (7th Cir. 2018), we concluded that an officer's use of force may have been unreasonable where the suspect stopped resisting, stepped away from the officer, and said "I surrender" twice before the officer shot him. *Id.* at 916. In contrast, Mr. Manery's collision with Deputy Wilcox's vehicle was not a clear surrender.[16] Therefore, it was not clear that the threat to Lieutenant Lee and others had diminished. Nor is *Lytle v. Bexar County*, 560 F.3d 404 (5th Cir. 2009), sufficiently analogous.[17] In that case, the Fifth Circuit determined

---

[15] One of those cases, *Smith v. Finkley*, 10 F.4th 725 (7th Cir. 2021), was decided after the events giving rise to this case occurred. As such, it may not be considered for purposes of determining whether the law was clearly established at the time of the challenged conduct. *See Findlay v. Lendermon*, 722 F.3d 895, 900 (7th Cir. 2013). In another of those cases, we affirmed the grant of qualified immunity to an officer who put his gun to the head of a suspect who "was neither incapacitated nor complying with orders." *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 991 (7th Cir. 2021). Although we acknowledged the general proposition that "[w]hile an officer may be authorized to use deadly force at one moment, it is not a blank check," *id.* at 987, it is difficult to see how *Lopez* helps Mr. Manery's case, because in that case we decided the law was not clearly established and did not reach the constitutional question.

[16] At this stage, we must assume that the collision "prevented [him] from continuing to drive forward." Appellee's Br. 9. However, Mr. Manery had hit other obstacles, namely Deputy White's car and the curb, and maneuvered his way out of these collisions to continue to flee.

[17] We examine this case from our sister circuit because, "[i]n the absence of controlling precedent from our circuit, [we] look to other circuits to ascertain whether there was such a clear trend in the case law that the ( … continued)

that the suspect may no longer have posed a threat because he had been driving away from the officer for at least three to ten seconds when the officer fired. *See id.* at 413–14. By contrast, Lieutenant Lee had less time to evaluate the situation before firing than did the officer in *Lytle.* Moreover, Mr. Manery was stopped, as opposed to driving away, when Lieutenant Lee fired. None of the cases Mr. Manery put forward are sufficiently analogous to have rendered the law clearly established.

Just as importantly, the record demonstrates that Lieutenant Lee was in a position where he had to determine immediately whether Mr. Manery continued to pose a threat. Lieutenant Lee did not know whether Mr. Manery might well continue his escape attempt, either in the automobile or on foot, and whether any further resistance would include the use of the weapon which Lieutenant Lee had been advised he possessed. Lieutenant Lee also had been informed that Mr. Manery might well attempt "suicide by cop." Lieutenant Lee did not have to take the "apparent surrender at face value, a split second after" Mr. Manery's vehicle stopped. *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009).[18] Finally, Lieutenant Lee had to take into consideration not only his own safety but

---

recognition of the right by a controlling precedent was merely a matter of time." *Est. of Escobedo v. Bender*, 600 F.3d 770, 782 (7th Cir. 2010).

[18] In *Johnson*, the suspect initially fled from police but later surrendered by putting his hands in the air and saying, "I give up." *Johnson v. Scott*, 576 F.3d 658, 659 (7th Cir. 2009). For five to ten seconds after the surrender, the officer did not restrain his K-9, who bit the suspect. This court held that the use of force was objectively reasonable, because the officer "had no idea how [the suspect] was going to behave once he was cornered." *Id.* at 660.

that of the other officers accompanying him on this dangerous task. As we noted earlier, a government officer in Lieutenant Lee's position must have "breathing room to make reasonable but mistaken judgments about open legal questions." *al-Kidd*, 563 U.S. at 743. A reasonable officer in Lieutenant Lee's position would not have known that the use of deadly force could run afoul of Mr. Manery's Fourth Amendment rights. It was not clearly established that Lieutenant Lee's use of deadly force was unreasonable, and, accordingly, he is entitled to qualified immunity.

## Conclusion

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED

LEE, *Circuit Judge*, dissenting: My colleagues conclude that we have jurisdiction to consider Lieutenant Jason Lee's interlocutory appeal and that he is entitled to qualified immunity. To secure appellate jurisdiction, however, Lieutenant Lee's qualified immunity argument must rest entirely on undisputed facts or disputed facts that are construed in William Manery's favor. As I shall explain, this is not the case. Indeed, if we take Mr. Manery's version of events (rather than Lieutenant Lee's), the officer's actions are clearly proscribed by precedent. As such, I would dismiss this appeal for lack of jurisdiction, and I respectfully dissent.

## I.

Although a district court's decision denying qualified immunity may be subject to interlocutory appeal, *Mitchell v. Forsyth*, 472 U.S. 511, 525–27 (1985), such a denial only triggers appellate review in very limited circumstances, *see Johnson v. Jones*, 515 U.S. 304, 313 (1995). As the majority opinion correctly notes, qualified immunity is an immediately appealable collateral order only "to the extent that it turns on an issue of law." *Mitchell*, 472 U.S. at 530; *see Stewardson v. Biggs*, 43 F.4th 732, 734 (7th Cir. 2022) (citing cases). Thus, "we may not review a determination that the evidence is sufficient to proceed to trial." *Dockery v. Blackburn*, 911 F.3d 458, 461 (7th Cir. 2018) (citing *Johnson*, 515 U.S. at 319–20 and *Stinson v. Gauger*, 868 F.3d 516, 524 (7th Cir. 2017) (*en banc*)). "'Of course, any reference to a disputed fact, however cursory, is not automatically disqualifying.'" *Smith v. Finkley*, 10 F.4th 725, 735 (7th Cir. 2021) (quoting *Estate of Williams v. Cline*, 902 F.3d 643, 649 (7th Cir. 2018)). And sometimes there is a "hazy line" between "a non-appealable factual dispute and an appealable abstract legal question." *Id.* at 735–36 (quoting *Gutierrez v. Kermon*, 722

F.3d 1003, 1011 (7th Cir. 2013)). To help discern this line, we have developed a two-factor test. *Id.*

First, we "closely examine whether the district court identified disputes of fact as the basis for denying qualified immunity." *Davis v. Allen*, 112 F.4th 487, 493 (7th Cir. 2024). And second, we consider whether the party requesting immunity, rather than relying on undisputed facts, is making "a 'backdoor effort' to use disputed facts" under the guise of undisputed facts. *Finkley*, 10 F.4th at 736 (citing *Strand v. Minchuk*, 910 F.3d 909, 913–14 (7th Cir. 2018); *Gutierrez*, 722 F.3d at 1010–11; *Jones v. Clark*, 630 F.3d 677, 680–81 (7th Cir. 2011)). "When we answer yes to both questions … we lack jurisdiction over the appeal." *Stewardson*, 43 F.4th at 736.

## II.

Before applying this test here, we must review the law governing the use of deadly force. A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment, and consequently that use of force must be reasonable. *See Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002). The Supreme Court has held that an officer acts reasonably when deploying deadly force if he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or that the suspect "committed a crime involving the infliction or threatened infliction of serious physical harm." *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985). "The fundamental question is 'whether the totality of the circumstances justified [the] particular sort of … seizure.'" *Finkley*, 10 F.4th at 736 (quoting *Garner*, 471 U.S. at 8–9).

We have previously considered an officer's use of deadly force on a suspect operating a moving vehicle. For instance, *Scott v. Edinburg* involved an off-duty police officer, who had stopped at a gas station and exited his car to get something to eat at a nearby food stand. 346 F.3d 752, 754 (7th Cir. 2003). While at the food stand, he learned that an individual had entered his car to steal it. *Id.* The officer ran back to his car, yelling "stop." *Id.* Hearing this, the suspect first reversed the car towards the officer, causing the officer to move away and draw his weapon. *Id.* The suspect then started to drive forward. *Id.* The officer fired his gun at the suspect, but whether he fired his first shot while the vehicle was backing up or after it had started to pull away was disputed. *Id.* The officer argued that the shooting was justified because the suspect had threatened him with a deadly weapon by trying to back over him with the vehicle. *Id.* at 757. Persuaded, the district court granted summary judgment in his favor, but we reversed, noting that "[i]f the fatal shot was fired while [the suspect] was driving away, then the argument that [the officer] was compelled to fire in order to protect himself would be significantly weakened." *Id.* at 757–58.

Additionally, in *Estate of Starks v. Enyart*, officers approached a suspect in a stolen vehicle sitting in a parking lot from three sides. 5 F.3d 230, 232 (7th Cir. 1993). Attempting to flee, the suspect put the car into reverse, hitting a police car that was blocking his path. *Id.* He then tried to drive forward and to his right, but a utility pole blocked his path. *Id.* The suspect then reversed again but, this time, more at an angle so that the front of the car could clear the pole. *Id.* He then floored the accelerator, propelling the car forward. *Id.* While he was doing this, one of the officers was positioned behind the utility pole with the pole standing between himself and

the car. *Id.* The officer jumped out from behind the pole and stepped in front of the moving car. *Id.* As this was transpiring, the three officers fired their guns at the suspect. *Id.* The district court denied the officers' motion for summary judgment based on qualified immunity, and the officers appealed. *Id.* In our view, the key fact was whether the officer had jumped out from behind the pole before or after the car began speeding forward. *Id.* at 234. If the former, the propelling vehicle placed the officer in serious danger, and the officers acted reasonably in shooting the suspect. *Id.* If the latter, the officer acted unreasonably by creating his own peril. *Id.* Because the timing of the shots was disputed, we dismissed the appeal for lack of jurisdiction. *Id.* at 232–33, 35.

What instruction do these cases provide officers about firing their weapons at a suspect operating a moving vehicle? The lesson is straightforward: they teach officers that firing at an operator of a moving vehicle is reasonable if the moving vehicle poses a serious threat to their safety or the safety of others. More specifically, an officer is entitled to fire at a moving vehicle if the vehicle is speeding towards him, putting him at risk of being run over. On the other hand, if the vehicle is not moving in the officer's direction or if something is impeding the vehicle's path to the officer so as to eliminate any threat, use of deadly force is unreasonable. With that, we turn to the case at hand.

### III.

### A.

To place himself within the zone of reasonableness articulated in *Scott* and *Starks*, Lieutenant Lee argued on summary judgment that he was entitled to qualified immunity "for his split-second decision to fire at Manery as he *drove towards him* in the Jeep." According to Lieutenant Lee, Mr. Manery "drove the Jeep *straight toward* [him]," and "[a]s Manery drove the Jeep *toward* [him], [Lieutenant Lee] fired at him." But the video footage of the encounter contradicts Lieutenant Lee's account.

Rather than a vehicle barreling towards an officer, the footage shows Mr. Manery's white Jeep accelerating in reverse away from the officers, striking the curb at the edge of the parking lot with its rear tires, turning slightly to the left, accelerating forward, immediately colliding with a black unmarked vehicle at a perpendicular angle, and coming to a complete stop. At this point, the truck is trapped. It is hemmed in by the curb behind, the car to its right, and the vehicle in front. And it is only after this that Lieutenant Lee, who is standing off to the side of the truck, fires his weapon into the driver's side where Mr. Manery is sitting.

Although photographs are poor substitutes for video, still images captured from the video footage illustrate the truck's progression:





Notably, the video does not capture Lieutenant Lee when he discharges his weapon. This is because he is standing well to the side of the truck, and the balcony obstructs our view. But we hear the shooting *after* the Jeep comes to a stop by colliding with the black vehicle—five shots, a pause, then four more.

This evidence directly contradicts (or certainly puts into question) Lieutenant Lee's contention that the Jeep was barreling towards him when he fired his gun. And, unsurprisingly, this is what led the district court to deny Lieutenant Lee's request for summary judgment on the issue of qualified immunity.

On appeal, Lieutenant Lee tries to change tack and reframes the question to be whether "in that tense and rapidly evolving encounter with a wanted suspect he believed was armed, the Fourth Amendment required him to pause to re-evaluate the situation when Manery came to a stop after hitting the second police car." But the "rapidly evolving encounter" includes the truck's location and speed in relation to Lieutenant Lee when he fired his weapon—facts which the parties dispute. Indeed, although Lieutenant Lee claims to accept Mr. Manery's version of events, his brief takes the officer's account. *See, e.g.*, Appellant's Br. at 2 ("Within three seconds of Manery starting to drive *forward* after hitting the curb, Lt. Lee fired."), 9 ("the video showed that Manery had turned his wheels to the left *toward* Lt. Lee just before Lt. Lee fired."), 15 ("Manery did drive *in Lt. Lee's direction*.").

Going back to our two-factor test, we can answer both questions in the affirmative. One, the district court found that disputed facts regarding the trajectory and location of the Jeep vis-à-vis Lieutenant Lee precluded summary judgment on the

officer's qualified immunity defense. And two, Lieutenant Lee's argument assumes the veracity of the facts as he sees it; it does not rest on undisputed facts, nor does it take Mr. Manery's rendition of the facts to be true. Because Lieutenant Lee's arguments "'are dependent upon, and inseparable from, disputed facts,' we do not have jurisdiction to consider the appeal." *Koh v. Ustich*, 933 F.3d 836, 843–44 (7th Cir. 2019) (quoting *Gant v. Hartman*, 924 F.3d 445, 448–49 (7th Cir. 2019)). Our inquiry should end here.

The majority opinion, however, sees it differently. First, it premises its qualified immunity analysis on "Lieutenant Lee's acceptance of Mr. Manery's version of the facts." Majority op. at 7. Then, it relies on the second prong of the qualified immunity test—whether the constitutional right at issue was "clearly established" at the time of the shooting—to conclude that no reasonable officer in Lieutenant Lee's shoes would have understood from our cases that firing at the truck was unreasonable.[1]

As to the first point, I have explained why Lieutenant Lee's qualified immunity theory is dependent on his view of the facts. Whether the truck was fully stopped at the time the officer fired his gun and, thus, did not pose a threat to Lieutenant Lee or anyone else is at least debatable; a reasonable jury could find either way. The second point—whether the

---

[1] As the majority opinion aptly states, an official will be protected by qualified immunity "unless the plaintiff shows: '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" Majority op. at 9 (quoting *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))).

law proscribing Lieutenant Lee's conduct was clearly estab-
lished—requires some more exposition.

**B.**

The majority opinion is correct to note that, when evaluat-
ing the existence of clearly established law, we cannot define
the constitutional right in question at too high a level of gen-
erality. *See City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021); *City
of Escondido v. Emmons*, 586 U.S. 38, 42 (2019); *Kisela v. Hughes*,
584 U.S. 100, 104 (2018) (citing cases). On the other hand, it is
not necessary to identify a case "directly on point." *Ashcroft v.
al-Kidd*, 563 U.S. 731, 741 (2011). Rarely will the facts of one
case precisely mirror those of another. This is why a case can
clearly establish a constitutional right even though its facts are
not "fundamentally similar" or even "materially similar" to
the facts in question. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).
What matters is that "the contours of the right are sufficiently
clear that every reasonable official would have understood
that what he is doing violates that right." *al-Kidd*, 563 U.S. at
741 (cleaned up).

I believe that *Scott* and *Starks* clearly establish that it is un-
reasonable for an officer to use deadly force on an individual
operating a vehicle when the vehicle is not speeding towards
him or others, thereby creating an imminent threat of serious
harm. But to my colleagues, "these cases are not sufficiently
analogous to Lieutenant Lee's encounter with Mr. Manery
and therefore are not an impediment to the grant of qualified
immunity." Majority op. at 11. As the majority sees it, what
distinguishes this case from *Scott* is that the suspect in *Scott*
was driving away from the officer, while Mr. Manery was not.
As for *Starks*, the majority opinion focuses on the fact that the
officer in *Starks* may have put himself in harm's way, while

Lieutenant Lee did not. But, by focusing on these facts, the majority opinion loses sight of the pertinent lesson that these cases teach: an officer is entitled to fire at an operator of a moving vehicle if the vehicle is speeding towards him or others, putting their safety at risk; however, he acts unreasonably if he fires at a vehicle when it is no longer moving towards him or others, abating that risk.

This rule does not define Mr. Manery's right at too high a level of generality. Compare this to the broader principle that an officer may not use deadly force unless he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Muhammed*, 316 F.3d at 683 (quoting *Garner*, 471 U.S. at 11–12). Or even the rule that an officer may not use deadly force once he no longer faces an imminent threat of harm. *See Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993). The latter propositions are unquestionably general statements of law. By contrast, *Scott* and *Starks* apply those general principles to the *particular* scenario of when an officer confronts an operator of a moving vehicle, and they make it abundantly clear that it is unreasonable for an officer to shoot at an operator of a vehicle when the vehicle is no longer moving directly towards him or others. In other words, *Scott* and *Starks* "'squarely govern[]' the specific facts at issue" here. *Kisela*, 584 U.S. at 104 (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (*per curiam*)).

In an attempt to further distinguish *Scott* and *Starks*, the majority asserts that "Lieutenant Lee was in a position where he had to determine immediately whether Mr. Manery continued to pose a threat." Majority op. at 13. This is so, the majority opinion posits, because, even after the truck came to a complete stop, Lieutenant Lee "did not know whether Mr.

Manery might well continue his escape attempt, either in the automobile or on foot"; whether Mr. Manery might use a weapon, "which Lieutenant Lee had been advised he possessed"; and whether Mr. Manery would commit "suicide by cop." *Id.* The problem is that each of these propositions assumes Lieutenant Lee's account of events to be true and gives him the benefit of all factual inferences. Indeed, there is no indication in the record that Mr. Manery was trying to do any of these things (or even appeared to be trying to do any of these things) after the truck became pinned between the curb and the two police cars. For example, there is no evidence that Mr. Manery made any movement to open the door, or that he was reaching for something in his car, or that he was yelling threats or obscenities at the officers to initiate a confrontation. An officer's belief that an individual might be dangerous does not, without more, justify the use of deadly force. *See Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (noting that the prohibition on the use of force applies "notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon").

Of course, the record does not necessarily foreclose these things either, and additional facts bearing on these issues might be introduced at trial. But, at this stage, we must construe the present record in Mr. Manery's favor and give him the benefit of all reasonable inferences.

Viewed through this lens, the record shows that Mr. Manery had wedged his truck between the curb and a police car; he made no movement to indicate to officers that he was going to run or confront them in any way; Lieutenant Lee was standing off to the side of the vehicle; and he fired multiple shots at Mr. Manery after the car became lodged and could

not move. In this scenario, I believe that *Scott* and *Starks* gives notice to any reasonable officer in Lieutenant Lee's shoes that he should not fire shots into the vehicle and that doing so would violate Mr. Manery's constitutional rights.

For these reasons, I respectfully dissent.